**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VERIZON CALIFORNIA, INC.,
            *Plaintiff-Appellant,*

v.

MICHAEL R. PEEVEY; LORETTA M.
LYNCH; CARL W. WOOD; GEOFFREY
F. BROWN; SUSAN P. KENNEDY, in
their official capacities as
Commissioners of the Public
Utilities Commission of the State
of California, and not as
individuals; PAC-WEST TELECOMM,
INC.,
            *Defendants-Appellees.*

No. 04-16382

D.C. No.
CV-03-03441-CW

10757

PAC-WEST TELECOMM, INC.,
*Counter-claimant-Appellant,*

v.

VERIZON CALIFORNIA, INC.,
*Counter-defendant-Appellee,*

v.

PAC-WEST TELECOMM, INC.,
*Cross-claimant-Appellant,*

v.

MICHAEL R. PEEVEY; LORETTA M.
LYNCH; CARL W. WOOD; GEOFFREY
F. BROWN; SUSAN P. KENNEDY, in
their official capacities as
Commissioners of the Public
Utilities Commission of the State
of California, and not as
individuals,
*Cross-defendants-Appellees.*

No. 04-16394

D.C. No.
CV-03-03441-CW

OPINION

Appeals from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
June 12, 2006—San Francisco, California

Filed September 7, 2006

Before: Pamela Ann Rymer, Thomas G. Nelson, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Rymer

**COUNSEL**

Burton A. Gross, Munger, Tolles & Olson, San Francisco, California, for the plaintiff-appellant/cross-appellee.

D. Anthony Rodriguez, Morrison & Foerster, San Francisco, California, for defendant-appellee/cross-appellant Pac-West Telecomm, Inc.

Lindsay M. Brown, California Public Utilities Commission, San Francisco, California, for defendants-appellees/cross-appellees Commissioners of the Public Utilities Commission.

**OPINION**

RYMER, Circuit Judge:

These appeals arise out of a dispute between local exchange carriers over the identification of internet-bound traffic, and compensation for delivery of telephone calls to internet service providers and for calls that appear to the customer to be made within a local area code but in fact are not. One of the carriers, Verizon California, Inc., had an exclusive franchise within California before passage of the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* However, the Act established a competitive system whereby "incumbent"

local exchange carriers such as Verizon must share their networks with "competitive" carriers such as Pac-West Telecomm, Inc. It also provides that disagreements are to be referred for arbitration to the state public utility commission, in this case, the California Public Utilities Commission (CPUC). Verizon and Pac-West entered into an interconnection agreement in 1996, but when they reached an impasse in negotiating a new agreement in 2001 and referred the dispute to the CPUC, the commission ruled in Pac-West's favor that (1) during the interim period before a new agreement was in place, the parties' 1996 agreement continued in force such that Verizon must continue to pay reciprocal compensation for delivery of internet-bound calls at pre-existing rates rather than at the lower capped rates set by the Federal Communications Commmission (FCC) that apply to new contractual obligations; (2) Pac-West could exclude calls to paging services before applying an FCC presumption that when terminated calls are more than three times the number of originated calls, the excess calls are bound for internet service providers; and (3) Pac-West is entitled to reciprocal compensation for traffic that appears to originate and terminate within a single exchange by virtue of Pac-West's assignment of a number that appears to be "local," but in fact is not — so-called "Virtual Local" or "VNXX" traffic. The CPUC ruled in Verizon's favor that Verizon is entitled to collect call origination charges for its cost of transporting Virtual Local traffic to a distant point of interconnection. The district court found that the commission's decision was not arbitrary or capricious. Both parties appeal. We agree with the district court, and therefore affirm all rulings except for the commission's determination that Pac-West may disregard paging traffic for purposes of computing the presumptive volume of traffic bound for an internet service provider (ISP). As to that issue, federal law is to the contrary. Accordingly, we reverse and remand the ruling on calls to paging customers.

# I

## A

Until passage of the Telecommunications Act, local telephone service was provided primarily by a single company within each local area that had an exclusive franchise to serve an authorized territory within the state. The Act replaced this system with a competitive regime under which incumbent local exchange carriers, or ILECs, such as Verizon, are obliged to permit competitive local exchange carriers, or CLECs, such as Pac-West, to interconnect "at any technically feasible point within the [ILEC's] network." 47 U.S.C. § 251(c)(2)(B). Interconnection allows customers of one LEC to call the customers of another, with the calling party's LEC (the "originating" carrier) transporting the call to the connection point, where the called party's LEC (the "terminating" carrier) takes over and transports the call to its end point. To ensure that each LEC is fairly compensated for such calls, the Act requires interconnected LECs to "establish reciprocal compensation arrangements" with one another "for the transport and termination of telecommunications." 47 U.S.C. §251(b)(5). Under a reciprocal compensation arrangement, the originating LEC must compensate the terminating LEC for delivering its customer's call to the end point. The FCC has determined that this reciprocal compensation requirement applies only "to traffic that originates and terminates within a local area." *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, 11 F.C.C. Rcd. 15499, 16013, ¶ 1034 (Aug. 8, 1996) (subsequent history omitted) (the *Local Competition Order*). Thus, "[t]he Act preserves the legal distinctions between charges for transport and termination of local traffic and interstate and intrastate charges for terminating long-distance traffic." *Id.* at 16013, ¶ 1033.

Under the Act, ILECs and CLECs have a duty to negotiate in good faith the terms of their network sharing, including

rates of reciprocal compensation. 47 U.S.C. § 251(c)(1). A voluntary agreement reached by the parties need not conform to all of the requirements of § 251, 47 U.S.C. § 252(a)(1), and the state public utility commission reviews voluntary agreements only for limited purposes, 47 U.S.C. § 252(e)(2)(A). However, if the state public utility commission is asked to resolve open issues by means of compulsory arbitration, 47 U.S.C. § 252(b)(1), the Act requires that it "ensure that such resolution and conditions meet the requirements of section 251 [of the Act], including the regulations prescribed by the [FCC] pursuant to section 251 . . . ." 47 U.S.C. § 252(c)(1); *see also* 47 U.S.C. § 252(e)(2)(B).

Two wrinkles in the reciprocal compensation regime of § 251 are at the crux of this appeal. First, there was confusion from day one about whether the reciprocal compensation requirement should apply to local calls made via modem to an ISP. Following a tortured history that we do not detail, the issue was resolved (for now) when the FCC concluded in 2001 that ISP-bound calls are not subject to reciprocal compensation. *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996; Intercarrier Compensation for ISP-Bound Traffic*, 16 F.C.C. Rcd. 9151, 9189, ¶ 82 (Apr. 27, 2001) (the *ISP Remand Order*).[1] In the *ISP*

---

[1]In *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996; Intercarrier Compensation for ISP-Bound Traffic*, 14 F.C.C. Rcd. 3689 (Feb. 26, 1999) (*ISP Order*), the FCC applied an "end to end" analysis of ISP traffic, treating the user's call to the ISP in conjunction with the ISP's connection to the internet, to conclude that ISP-bound "local" calls were in fact interstate calls and thus not subject to reciprocal compensation under federal law. State commissions were free to come out differently. CPUC issued two generic rulemaking decisions in 1999 under which all existing interconnection agreements providing reciprocal compensation for local calls were interpreted to include ISP-bound calls. *Order Instituting Rulemaking and Investigation on the Commission's Own Motion into Competition for Local Exchange Service*, CPUC Decision No. 98-10-057, 82 C.P.U.C. 2d 492, 1998 WL 1109251 (Oct. 22, 1998), *modified on rehearing by* CPUC Decision No. 99-07-047,

*Remand Order*, the FCC held that § 251(g) carves out a category of telecommunications traffic not subject to the reciprocal compensation requirement of § 251(b)(5), *id*. at 9165-66, ¶¶ 31-32, and that ISP-bound traffic is within this category, *id*. at 9166-67, ¶ 34. The FCC prohibited reciprocal compensation for termination of calls to an ISP for carriers that did not exchange traffic prior to the order. *Id*. at 9188-89, ¶ 81. For carriers that were already exchanging traffic prior to the order, the FCC established an interim regime according to which reciprocal compensation rates for ISP-bound calls were capped, with the rate cap declining over time toward zero. *Id*. at 9155-57, ¶¶ 7-8, 9186-87, ¶¶ 77-78. This was done to eliminate the regulatory arbitrage opportunity available to CLECs. Also, "[i]n order to limit disputes and costly measures to identify ISP-bound traffic," the FCC adopted

> a rebuttable presumption that traffic exchanged between LECs that exceeds a 3:1 ratio of terminating to originating traffic is ISP-bound traffic subject to the compensation mechanism set forth in this Order. . . . Carriers that seek to rebut this presumption, by showing that traffic above the ratio is not ISP-bound traffic or, conversely, that traffic below the ratio is ISP-bound traffic, may seek appropriate relief from their state commissions pursuant to section 252 of the Act.

1999 WL 703040 (July 22, 1999) (the *Generic Internet Orders*). However, we invalidated the *Generic Internet Orders* on the ground that the commission "lacks authority under the Act to promulgate general 'generic' regulations over ISP traffic." *Pac. Bell v. Pac-West Telecomm., Inc.,* 325 F.3d 1114, 1125 (9th Cir. 2003). Meanwhile, the D.C. Circuit reversed and remanded the *ISP Order* for "want of reasoned decision-making." *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 3 (D.C. Cir. 2000). On remand the FCC again concluded that ISP-bound calls are not subject to reciprocal compensation. *ISP Remand Order*, 16 F.C.C. Rec. at 9189, ¶ 82. Although the D.C. Circuit reversed once more, *WorldCom, Inc. v. FCC,* 288 F.3d 429, 433-34 (D.C. Cir. 2002), it left the rules set out in the *ISP Remand Order* in place. Accordingly, the *ISP Remand Order* remains binding.

*Id*. at 9157, ¶ 8. Finally, the FCC stated that "[t]he interim compensation regime we establish here applies as carriers renegotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions." *Id*. at 9189, ¶ 82. With the promulgation of these rate caps, "state commissions will no longer have authority to address this issue" after June 14, 2001.[2] *Id*.

The second wrinkle in the reciprocal compensation regime concerns VNXX traffic. Telephone numbers generally consist of ten digits in the form of NPA-NXX-XXXX. The first three digits indicate the Numbering Plan Area (or NPA), commonly known as the area code, and the next three digits refer to the exchange code. Under standard industry practice, area codes and exchange codes generally correspond to a particular geographic area served by an LEC. These codes serve two functions: the routing of calls to their intended destinations, and the rating of calls for purposes of charging consumers. Each NPA-NXX code is assigned to a rate center, and calls are rated as local or toll based on the rate center locations of the calling and called parties. When the NPA-NXX codes of each party are assigned to the same local calling area, the call is rated to the calling party as local; otherwise it is a toll call, for which the calling party must normally pay a premium.

VNXX, or "Virtual Local" codes are NPA-NXX codes that correspond to a particular rate center, but which are actually assigned to a customer located in a different rate center. Thus a call to a VNXX number that appears to the calling party to be a local call is in fact routed to a different calling area. The CPUC has determined that VNXX traffic should be rated to consumers as a local call, meaning that the originating LEC cannot charge the calling customer a toll despite the long-distance nature of the call's physical routing. *In re Competi-*

---

[2] The *ISP Remand Order* provided that its rulings would go into effect "30 days after publication in the Federal Register." *Id*. at 9204, ¶ 112.

*tion for Local Exchange Service*, CPUC Decision No. 99-09-029, 1999 WL 1127635, *11 (Sept. 2, 1999) (the *VNXX Decision*). In the course of its decision, the CPUC also stated:

> We conclude that all carriers are entitled to be fairly compensated for the use of their facilities and related functions performed to deliver calls to their destination, irrespective of how a call is rated based on its NXX prefix. Thus, it is the actual routing points of the call, the volume of traffic, the location of the point of interconnection, and the terms of the interconnection agreement—not the rating point—of a call which properly forms a basis for considering what compensation between carriers may be due.

*Id.* at *19. VNXX numbers are often assigned to ISP customers by CLECs, thus allowing the ISP to serve internet users outside the ISP's local calling area without subjecting such users to toll charges.

### B

Within a few months of the effective date of the 1996 Telecommunications Act, Verizon (then GTE California) and Pac-West entered into a negotiated interconnection agreement under which Verizon paid Pac-West reciprocal compensation for ISP-bound local calls terminated by Pac-West (the 1996 contract). Paragraph 9.02 of the 1996 contract established an initial term of one year, stated that it could be terminated by either party upon 60 day's notice, and provided that

> the other party at any time during such 60 day period, may request negotiation of a new interconnection agreement, in which case interconnection shall continue between the Parties in full accordance with all of the terms of this Agreement pending execution of a replacement interconnection agreement within 125 days from the date the agreement termi-

nates. If parties are unable to come to agreement within 125 days, both parties agree to seek resolution from the CPUC.

Neither party exercised the option until 2001. However, shortly after the *ISP Remand Order* was issued, Verizon took the position that reciprocal compensation payments for internet-bound traffic were no longer required. Pac-West objected to Verizon's unilateral imposition of the FCC's new, capped rate structure, and requested resolution by the CPUC. An ALJ ruled in favor of Pac-West on September 27, 2001, and the CPUC affirmed that ruling in January 2002. *Order Denying the Complaint of Verizon California Inc. Against Pac-West Telecomm., Inc.*, CPUC Decision No. 02-01-062 (Jan. 24, 2002). The CPUC held that the 1996 agreement's change-of-law provision did not cover the *ISP Remand Order*, and so compensation for ISP-bound traffic was not subject to the FCC's new rate caps.[3] *Id*.

On October 10, 2001, Verizon exercised its right to terminate the 1996 agreement, effective December 9, 2001. On December 3, Pac-West, in turn, requested negotiation of a new agreement, thereby invoking the 125-day contract renegotiation period in Paragraph 9.02. Several issues remained outstanding as April 13, 2002 — the end of the 125-day period — approached. Accordingly, on April 3, 2002, Verizon filed an emergency motion with the CPUC, invoking Paragraph 9.02 to request an expedited order establishing a temporary agreement with Pac-West pending adoption of a new interconnection agreement. In particular, Verizon requested that the reciprocal compensation rates applicable to ISP-bound local traffic be set in the interim agreement in conformance with the lower rates specified in the *ISP Remand Order*. On April 12, 2002, one day before the end of the 125-day negotiation period, CPUC Commissioner Michael R. Peevey imposed an interim agreement. He noted that the par-

---

[3]This ruling has not been challenged.

ties had failed to negotiate a provision in their existing agreement as to what terms would govern in the event of contract termination without a successor agreement, and found the only defensible alternative was to continue the status quo agreement for the interim period. With regard to reciprocal compensation for ISP-bound calls in particular, Commissioner Peevey ruled that the 1996 agreement's payment schedule would continue to apply instead of the FCC's capped rates, but that compensation exchanged during the interim period would be subject to later adjustment by the CPUC. On April 26, 2002, the CPUC adopted Commissioner Peevey's order in its entirety.

No progress having been made, on June 13, 2002 Verizon petitioned the CPUC for arbitration of a new agreement pursuant to § 252(b). The arbitrator issued a final report (the *Final Arbitrator's Report*) on February 10, 2003 that adopted Verizon's position with regard to reciprocal compensation rates for ISP-bound traffic in the interim period, ruling that an interconnection agreement "becomes an 'expiring' one when the ILEC gives notice to that effect, and the new intercarrier compensation arrangement [mandated by the *ISP Remand Order*] should thus become effective at the inception of negotiations." The arbitrator also determined that "[l]ocal traffic to customers reasonably identifiable as paging carriers will not be considered ISPs in the [interconnection agreement] when the [*ISP Remand Order*] is implemented, unless the order clearly and finally establishes otherwise." Finally, as to VNXX traffic, the arbitrator ruled that "[w]hether or not a call is 'local' depends solely upon the NPA-NXXs of the calling and called parties . . . and does not depend upon the routing of the call, even if it is outside the local calling area." An arbitrated interconnection agreement, consistent with the arbitrator's report, was filed by the parties on February 18, 2003.

On May 22, 2003, the CPUC modified and adopted the *Final Arbitrator's Report* (*Arbitration Decision*). The commission overturned the arbitrator's ruling on reciprocal com-

pensation for ISP-bound traffic under the interim agreement, holding that the FCC's rate caps could not be applied retroactively from the effective date of the new (2003) agreement. It noted that the FCC had stated in the *ISP Remand Order* that the order "does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions." One commissioner dissented on the footing that the 1996 agreement expired on April 14, 2002, and that "with the expiration of the interconnection agreement, the rates contained in the FCC's *ISP Remand Order* became effective." The CPUC adopted the arbitrator's position on paging traffic and reciprocal compensation for VNXX calls. With respect to VNXX calls, however, the CPUC further ruled that Verizon was entitled to collect call origination charges, or COCs, from Pac-West, so as to compensate Verizon for the transport of VNXX calls over long distances.

Verizon challenged these rulings in district court. Both parties, and the CPUC, filed cross-motions for summary judgment. The district court granted the CPUC's cross-motion regarding call origination charges on VNXX traffic, and the CPUC's and Pac-West's cross-motions regarding interim reciprocal compensation, paging traffic, and VNXX reciprocol compensation. Verizon appeals the adverse rulings with respect to interim reciprocal compensation, paging traffic, and VNXX reciprocal compensation. Pac-West cross-appeals judgment for Verizon on VNXX call origination charges. CPUC defends its rulings in all respects.

## II

"We review de novo the district court's grant[s] of summary judgment." *U.S. W. Commc'ns, Inc. v. Wash. Utils. & Transp. Comm'n*, 255 F.3d 990, 994 (9th Cir. 2001). We also "review de novo whether the arbitrated agreements are in compliance with the Act and the implementing regulations," and "review all other issues under an arbitrary and capricious

standard." *Id*. A state commission's decision is arbitrary and capricious if the decision "was not supported by substantial evidence," or the commission made a "clear error of judgment." *Pac. Bell*, 325 F.3d at 1131 (internal quotation marks omitted).

## III

The central issue on appeal is whether the *ISP Remand Order* should govern compensation for ISP-bound traffic exchanged between the parties during the period from December 3, 2001 (when Pac-West requested renegotiation), or from April 13, 2001 (when the 125-day contractual period for renegotiation expired), until CPUC handed down its arbitration decision approving a new, arbitrated interconnection agreement. Verizon advances a number of reasons why the decision is arbitrary. It argues that extending its obligation to pay intercarrier compensation at rates above the FCC's caps violates Paragraph 82 of the *ISP Remand Order* which, as of June 14, 2001, stripped all state commissions of authority to impose any rate structure other than that set forth in the order. While Verizon recognizes that the *ISP Remand Order* excepts enforcement of an "existing contractual obligation," it maintains that the exception is inapplicable here because, at least after April 13, 2002, there was no contractual agreement between the parties requiring payment of reciprocol compensation for internet-bound traffic at rates higher than the FCC's caps. In effect, Verizon contends, the CPUC's decision simply perpetuates through the back door the generic rulemaking that this court invalidated in *Pacific Bell*. Verizon submits that the *Arbitration Decision* also violates the *ISP Remand Order* because the order directs that the FCC's capped rates go into effect "*as*" carriers renegotiate "expired or expiring" interconnection agreements. In its view, the 1996 agreement began "expiring" as of December 3, 2001 when Pac-West requested renegotiation and was "expired," at the latest, as of April 13, 2001 when the renegotiation period ended. Thus, Verizon posits, the interim interconnection agreement imposed by

CPUC was itself a *new* agreement subject to the FCC's rate cap.

**[1]** We hold that the CPUC did not act in derogation of federal law by extending the status quo, that is, in continuing the reciprocal compensation terms of the 1996 agreement after Pac West requested renegotiation and until the new (2003) interconnection agreement was in place. There is no question that the FCC caps apply to the 2003 agreement. However, when the parties couldn't agree within the contractual time frame, it fell to the CPUC, pursuant to the 1996 agreement, to decide how interconnection would be governed in the meantime. Neither the Act nor the *ISP Remand Order* requires reversal of the CPUC's interim directive. This is so for two independent reasons.

**[2]** First, it does not appear that federal law applies to the *Interim Order*. Parties who enter into a voluntary interconnection agreement need not conform to the requirements of the Act, 47 U.S.C. § 252(a)(1), and a state commission need not review such agreements for compliance with § 251, 47 U.S.C. § 252(e)(2). Accordingly, if Verizon and Pac-West had reached a new private agreement imposing reciprocal compensation on ISP-bound traffic above the FCC's mandated rate caps for the duration of the interim negotiation period, that agreement would be binding on the parties regardless of the *ISP Remand Order*. If Verizon and Pac-West had reached such an agreement with the assistance of a private arbitrator, the conclusion would be no different. Only if the parties sought mandatory arbitration from the commission under § 252(b)(1) would the restrictions of the Act, and thus the *ISP Remand Order*'s interpretation of § 251(b)(5), apply to the interconnection agreement. 47 U.S.C. § 252(c).

**[3]** Verizon did not invoke § 252(b)(1) in requesting an emergency interim agreement. Rather, it cited Paragraph 9.02 of the 1996 agreement. Indeed, it does not appear that Verizon *could* have requested compulsory arbitration under the Act.

While Paragraph 9.02 of the 1996 agreement provides that parties may seek resolution by the CPUC "within 125 days" of Pac-West's request to negotiate a new agreement, § 252(b)(1) of the Act may be invoked only "[d]uring the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section . . . ." The parties were not yet within this period when Verizon made its emergency plea to the CPUC.

The fact that Verizon invoked a contractual provision, and could not invoke the Act, in requesting the commission's assistance, suggests that the CPUC in imposing an interim agreement acted as an ordinary private arbitrator not subject to the restrictions of the Act. Such a role for the commission is contemplated by the Act. Section 252(a)(2) provides that "[a]ny party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation." A commission acting in this capacity is not required by the Act to implement the provisions of § 251. *See* 47 U.S.C. § 252(c) (requiring only commissions acting in their compulsory arbitration capacity pursuant to § 252(b) to implement § 251). We therefore believe that Paragraph 9.02 of the 1996 agreement gave the CPUC freedom to impose any terms it believed necessary on a temporary basis to resolve the parties' disagreement.

Alternatively, even if the commission were required to comply with the *ISP Remand Order*, we are persuaded that it did. Paragraph 82 of the *ISP Remand Order* controls the application of the FCC's new rate caps. This paragraph provides in relevant part that "[t]he interim compensation regime we establish here applies as carriers renegotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations . . . ." 16 F.C.C. Rec. at 9189, ¶ 82. This means that for the new FCC rate caps to apply, the parties must be renegotiating an "expiring or expired" agreement

*and* application of the new rates would not "alter existing contractual obligations."

**[4]** Verizon relies on both prongs but for different time periods — the period after April 13, 2002 and before approval of the 2003 agreement, and the period between December 4, 2001 and April 13, 2002. While not perfectly clear, the *Arbitration Decision* reflects the commission's determination that the interim agreement represents an extension of Verizon's existing contractual obligations in the 1996 agreement, rather than an entirely new agreement. Substantial evidence supports this determination, given that the *Interim Order* characterized the interim agreement as "the temporary extension of the old interconnection agreement." As the district court observed, this is not an issue of federal law answered by the *ISP Remand Order*, but rather is an issue governed by state contract law and principles. *See Pac. Bell*, 325 F.3d at 1128 (citing *S.W. Bell v. Pub. Util. Comm'n*, 208 F.3d 475, 485 (5th Cir. 2000)). In light of Paragraph 9.02 of the 1996 agreement, which Verizon invoked in requesting an interim agreement and which grants the commission unqualified authority to arbitrate the parties' disputes, the CPUC's interpretation of the nature of the interim agreement resolves its status. Because the 1996 agreement remained in effect after April 13, 2002, it was not, as Verizon insists, "expired." It follows that the CPUC's ruling in the *Arbitration Decision* that the FCC rate caps did not apply during this period was not arbitrary and capricious, but was in fact dictated by its earlier intent to continue the 1996 agreement in force in the interim.

Nor was the 1996 agreement "expiring" once Pac-West demanded renegotiation such that application of the FCC rate caps thereafter was required. Whether or not this agreement was "expiring" at that time — a process which, we suppose, begins to happen whenever a notice of termination is given — the FCC rate caps would alter the existing 1996 contractual obligations which were alive as of December 3, 2001 when renegotiation was requested. In any event, we have no diffi-

culty concluding that Verizon places too much weight on the language in Paragraph 82 of the *ISP Remand Order* that rate caps apply "*as* carriers renegotiate." It seems clear in context that when the FCC said that the rate caps were to apply "as carriers renegotiate" their interconnection agreements, it meant for the caps to apply *to the renegotiation*, not to transactions that take place *during* the renegotiation. Put differently, compliance with the *ISP Remand Order* requires LECs to incorporate the FCC's rate caps prospectively into the new interconnection agreement produced through renegotiation. This construction is not only grammatically plausible, it allows LECs to continue to abide by the terms of existing agreements, as they must, without changing those terms retroactively, even as they negotiate a new agreement that incorporates the FCC rate caps. In sum, to impose the new rate caps during the renegotiation period of an expiring contract would be to alter an "existing" contractual obligation, an outcome forbidden by the *ISP Remand Order* itself.

Verizon's related argument, that the CPUC ran afoul of Paragraph 82's proscription against a state commission's determining appropriate compensation for ISP-bound traffic, fares no better. Once the CPUC determined pursuant to its authority under Paragraph 9.02 of the 1996 agreement that the terms of that agreement temporarily continue in effect, the FCC rate caps do not apply in the first place. Therefore, the CPUC made no "determination" about appropriate reciprocal compensation to which Paragraph 82's bar could pertain. Although Verizon correctly notes that an extension theory (by contrast to its own take that the interim agreement was a new agreement) delays ultimate implementation of the new rate caps, nothing in the *ISP Remand Order* expressly precludes a state commission from making a decision of the sort the CPUC made here.

**[6]** Verizon suggests that there was no longer any basis for it to pay reciprocal compensation for ISP-bound traffic once the CPUC's *Generic Internet Rulings* were overturned by

*Pacific Bell* in 2003. We disagree. The commission had issued two generic rulemaking orders that concluded that ISP traffic was intrastate for jurisdictional purposes and local for purposes of interconnection agreements. However, as the FCC had defined ISP traffic as "interstate" for jurisdictional purposes in the *ISP Remand Order*, we held that the CPUC lacked authority under the Act to promulgate general "generic" regulations over ISP traffic. We noted that the commission's only authority over interstate traffic is the authority under § 252 to approve new arbitrated interconnection agreements and to interpret existing ones. In other words, *Pacific Bell* simply voided generic orders that purported to affect existing interconnection agreements without reference to any single, specific agreement; it had nothing to do with commission arbitrations of particular agreements such as occurred here. Thus, Verizon's obligation to pay reciprocal compensation for ISP-bound traffic arises from its own agreement and the *Arbitration Decision*'s interpretation of the 1996 agreement, not from the *Generic Internet Rulings*. While the 1996 agreement does not explicitly mention ISP-bound traffic, it does require Verizon to compensate Pac-West for the termination of all "local" calls. The CPUC's determination that calls destined for a local ISP are "local" within the meaning of the 1996 agreement is reasonable. Even the FCC has abandoned the notion, adopted in the original *ISP Order* but rejected by the D.C. Circuit, that ISP-bound calls are not local. Accordingly, during the December 3, 2001 to April 13, 2002 period, the 1996 agreement remained an "existing contractual obligation" with regard to reciprocal compensation for ISP-bound traffic, thereby rendering the FCC rate caps inapplicable.

IV

Verizon argues that the CPUC violated federal law governing the measurement of internet-bound traffic subject to the FCC's capped rates by allowing Pac-West to remove paging traffic from the total pool of terminated calls in computing the presumptive volume of ISP-bound traffic under the *ISP*

*Remand Order*. Rather than identifying and separately measuring internet-bound calls, Pac-West opted to rely on the FCC's 3-to-1 ratio separating ISP-bound calls from non-ISP-bound calls not subject to the FCC's capped rates. However, the CPUC, and the district court, allowed Pac-West to subtract out from the pool subject to the 3:1 ratio the calls Pac-West terminates to paging carriers. We agree with Verizon that this traffic, that is, calls to paging companies that are not ISP-bound, is already accounted for by the FCC's presumptive ratio, which provides that for every one minute of traffic Pac-West originates, three minutes of traffic Pac-West terminates will be deemed to be non-ISP traffic.

[7] This issue turns entirely on the interpretation of paragraphs 8 and 79 of the *ISP Remand Order*. For the sake of efficiency, the order adopts a presumption that traffic exceeding a 3:1 ratio of terminating calls to originating calls is ISP-bound and thus, subject to compensation on a capped basis. This relieves both CLECs and ILECs of the burden of actually establishing how many calls are ISP-bound and how many are not. Thus, if Pac-West were hypothetically to originate 100 calls and terminate 1,000 calls, 300 of the terminated calls are presumptively non-ISP-bound calls and 700 are presumptively ISP-bound calls. However, the presumption is rebuttable; a CLEC that wants to rebut the numbers produced by applying the 3:1 ratio may show that traffic above the ratio is not ISP-bound, or an ILEC may show that traffic below it is ISP-bound. The order thus allows a CLEC to show that the *actual* number of non-ISP-bound calls exceeds the *presumptive* number. What the commission's determination does, by contrast, is to allow Pac-West to *add* the number of calls identifiable as actually non-ISP-bound to the presumptive number. Returning to the hypothetical, if Pac-West were able to identify 50 paging calls that are not ISP-bound, under the commission's ruling it could exclude those 50 calls yet still rely on the presumption that 300 of its terminated calls are non-ISP-bound. In our view this is arbitrary, because the 50 non-ISP-bound calls are subsumed in the numerator, that is, *all* non-

ISP-bound calls are already included in the presumptive 3 to 1 ratio *unless* the CLEC shows that the ratio isn't an accurate enough reflection of reality. The only thing that Pac-West shows by identifying 50 paging calls is that *50* of its terminated calls are in fact not ISP-bound; it does not thereby show that *350* of its terminated calls are not ISP-bound. Put differently, to permit Pac-West to pull paging traffic out of the pool of terminated calls before the presumptive ratio is applied allows it to receive reciprocal compensation for all identifiable non-ISP-bound calls *plus* three times the number of originated calls — without any showing that it is not fairly compensated according to the 3:1 ratio.

We are not persuaded by the district court's observation that the end result is the same whether paging calls are excluded from the pool of terminated traffic before or after the presumptive ratio is applied. In its view, either approach is equally correct; in ours, each is equally incorrect. Under the construct of the *ISP Remand Order*, paging calls as a category of non-ISP-bound traffic should not be excluded *at all* because the whole universe of non-ISP-bound traffic (of which paging calls are part) is *included* in the pool both before *and* after the presumptive ratio is applied.

Applying the 3:1 ratio to the total pool of all terminated calls is an imminently reasonable approach. If there were no presumption as to the normal ratio between terminated and originated calls, parties would be forced to go to great lengths to distinguish ISP-bound from non-ISP-bound traffic. The presumption helps to avoid unnecessary work as it should accord with industry experience in the main. Assuming the ratio is a mostly accurate reflection of reality, both parties should be satisfied with how the ratio plays out in practice and neither ILECs nor CLECs should have an undue incentive to employ costly measures to rebut it. Although Pac-West protests that rebutting the 3:1 presumptive relationship between terminated and originated calls is harder under Verizon's reading than under CPUC's, it is hard precisely because

the ratio closely tracks reality. It is no answer that it would be easier for Pac-West to chip away at the pool before applying the 3:1 ratio, for to do so would defeat the whole point of presuming a relationship of all terminated to all originated calls.

The CPUC argues that paging traffic is excludable as a matter of state law because paging carriers are not telephone corporations, but this argument is flawed for similar reasons. Just as the FCC's presumption does not apply only to traffic terminated to non-paging carriers, it is also not limited only to traffic terminated to telephone corporations.

**[8]** We conclude that the CPUC erred in its *Arbitration Order* by allowing Pac-West to remove all paging traffic from the pool of total terminated traffic in calculating ISP-bound calls for purposes of applying the FCC's 3:1 ratio.

V

Finally on its appeal, Verizon contends that the decision to impose reciprocal compensation on Virtual NXX traffic was arbitrary and capricious as the CPUC provided no meaningful explanation for it and, in any event, the decision contradicts the commission's own rule, established in the *VNXX Decision*, that intercarrier compensation determinations for such traffic are properly based on the routing points — not the rating points — of a call. *See VNXX Decision*, 1999 WL 1127635, at *19.

**[9]** We disagree that CPUC failed to explain its decision. The CPUC adopted the *Final Arbitrator's Report*, which explains the VNXX reciprocal compensation ruling as follows:

> Whether or not a call is "local" depends solely upon the NPA-NXXs of the calling and called parties as established by Verizon's traditional local calling areas, and does not depend upon the routing of the

call, even if it is outside the local calling area. This is consistent with the Commission's consistent manner of rating calls, is an industry wide practice, and recognizes the essential difference in the parties' respective network architectures . . . . Intercarrier compensation obligations between these two carriers must be consistent with this precept unless the underlying rule is changed.

Thus, the ruling is not without rationale; in the CPUC's view, reciprocal compensation turns on whether a call is local, and determining whether a call is local based on the NPA-NXXs of the calling and called parties, not the routing of the call, is consistent with CPUC's traditional call rating regime, industry-wide practice, and recognition of essential differences between the parties' network architectures.

**[10]** Neither does the VNXX reciprocal compensation ruling represent an arbitrary departure from CPUC's earlier *VNXX Decision*. The *VNXX Decision* addressed two issues: the appropriate *rating to customers* of VNXX calls and the appropriate *intercarrier compensation* for such calls. As to rating, the CPUC ordered that "[c]alls shall be rated in reference to the rate center of the assigned NXX prefix of the called party," regardless of the called party's physical location. *VNXX Decision*, 1999 WL 1127635, at *19. That ruling did not, however, affect intercarrier compensation for VNXX calls. As to this issue, the CPUC ordered that

[t]he compensation exchanged between carriers related to the origination, switching, and routing of calls shall consider the actual routing points of the call, the volume of traffic, the location of the point of interconnection, and the terms of the interconnection agreement in situations where different rating and routing points are used.

*Id*. Verizon relies on the requirement that compensation arrangements should "consider the actual routing points of the

call," as opposed to the (local) rating point, to show that the *VNXX Decision* and the *Arbitration Decision* are irreconcilable. However, we do not believe that the *VNXX Decision* must be read as Verizon suggests.

First, it is not evident from the *VNXX Decision* that the CPUC had *reciprocal* compensation in mind when it suggested that actual routing points should be considered in determining intercarrier compensation. Rather, the commission's main concern appears to be compensation *to* the originating LEC, paid *by* the terminating LEC. Reciprocal compensation, by contrast, is paid *by* the originating LEC *to* the terminating LEC. The language upon which Verizon relies is expressly limited to "[t]he compensation exchanged between carriers related to the *origination*, *switching*, and *routing* of calls"; there is no reference to the *termination* of calls, the source of reciprocal compensation obligations. The CPUC's discussion further supports this interpretation, because it focuses on the compensation due to ILECs in exchange for their transporting VNXX calls out of the local calling area, but makes no mention of compensation due to CLECs for terminating those calls. *See, e.g.*, *id*. at *17 ("We conclude that, whatever method is used to provide a local presence in a foreign exchange, a carrier may not avoid responsibility for negotiating reasonable intercarrier compensation for the routing of calls from the foreign exchange merely by redefining the rating designation from toll to local."); *id*. ("Incumbents are entitled to fair compensation for the use of their facilities in the transport and termination of foreign exchange traffic."); *id*. at *19 ("We conclude that all carriers are entitled to be fairly compensated for the use of their facilities and related functions performed to deliver calls to their destination, irrespective of how a call is rated based on its NXX prefix."). Accordingly, the *VNXX Decision* does not apply on its face to reciprocal compensation arrangements.

Regardless, the *VNXX Decision* does not establish a clear rule as to whether such compensation is ever appropriate. The

effect of the decision is to require parties to "consider" physical routing in negotiating a compensation agreement; physical routing is but one of several considerations, and it does not dictate compensation. Therefore, a reciprocal compensation arrangement for VNXX calls does not necessarily violate its command. Balancing the considerations identified by the CPUC is fact-intensive, and the CPUC was careful to note that "the record at this point does not provide a sufficient basis to adopt appropriate preferred outcomes for intercarrier compensation arrangements for the transport and delivery of traffic involving different rating and routing points." *Id.* In short, the commission declined to issue any broad rule relative to intercarrier compensation for VNXX traffic. This being the case, we cannot say that its *Arbitration Decision* is plainly inconsistent with the *VNXX Decision*, or such a radical change of course from it that the *Arbitration Decision* may only stand with more expansive reasoning.

VI

Pac-West's cross-appeal also involves VNXX traffic, both non-ISP bound and ISP bound. While Pac-West supports the CPUC's decision to allow reciprocal compensation for Virtual NXX traffic, it challenges the decision to allow call origination charges for the same traffic. In a nutshell, its position is that once CPUC (correctly, in its view) decided that non-ISP VNXX traffic is rated and billed as "local traffic" for purposes of reciprocal compensation, it cannot then decide that VNXX traffic is also interexchange traffic such that ILECs can collect call origination charges.[4] In doing this, Pac-West

---

[4]As the First Circuit recently explained, "[l]ocal traffic stays within the boundaries of a local calling area. Interexchange (or 'non-local') traffic crosses the boundaries of a local calling area and is generally subject to toll or long-distance charges paid by the calling party." *Global NAPs, Inc. v. Verizon New England, Inc.*, 444 F.3d 59, 62-63 (1st Cir. 2006). Such traffic may be a "local toll" call which crosses the boundaries of local calling areas but stays within a local access and transport area, or a "long distance" call that crosses the boundaries of local calling areas. *Id.* at 63 n.1.

maintains, the CPUC created a "hybrid" version of traffic that it lacks authority to do. The primary reason is that, as Pac-West sees it, 47 C.F.R. § 51.703(b) precludes collection of origination charges for any calls subject to reciprocal compensation.

The CPUC, on the other hand, submits that it is inappropriate to rely on § 703(b) because Virtual Local traffic is similar to Extended Area Service and Foreign Exchange Service. It points out that if the centers for two exchanges are within twelve miles of one another, the calls between those exchanges are generally rated as local calls whereas, if the rate centers are more than twelve miles apart, the calls between the two are rated as toll calls. Accordingly, as it explained in the *Arbitration Decision*, for rating purposes, Virtual Local traffic is a local call but for routing purposes, it is an interexchange call because it terminates outside of the originating calling area. Separating the two, the commission says, is not unusual for, as an example, the FCC has done the same thing with high-speed service. The CPUC sees no inconsistency with federal law and disclaims having created a hybrid category, asserting that instead it balanced the benefits that a carrier is receiving for its use of another carrier's network with its obligation to compensate the other carrier for transporting Virtual Local calls. Verizon, in turn, emphasizes that otherwise, it incurs an uncompensated cost to "long haul" VNXX traffic to a distant point of interconnection between the carriers that distorts marketplace investments by CLECs like Pac-West and forces ILECs such as Verizon to provide an unwarranted subsidy. The problem, from its perspective, lies in the CPUC's decision establishing intercarrier compensation for this traffic, not in its ruling that Pac-West must pay Verizon for the cost of transporting the traffic to a distant point of interconnection.

**[11]** We agree that § 703(b), read in isolation, appears to bar a VNXX transport charge, but we conclude that it does not have such an effect in this case. Section 703(b) provides

that "[an] LEC may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network." However, as the CPUC and the district court recognized, the FCC has expressly excluded interexchange traffic from the reach of § 703(b). As § 701(b)(1) provides, § 703(b) does not apply to "telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access." 47 C.F.R. § 51.701(a)-(b). Here, the CPUC applied its *own* balancing test in determining as a matter of fair compensation policy that VNXX traffic is subject to reciprocal compensation as "local" traffic; it did not make that determination under the *Telecommunications Act* or the *FCC*'s rules for reciprocal compensation. Rather, the CPUC determined that VNXX traffic is interexchange traffic that is *not* subject to the FCC's reciprocal compensation rules. *Arbitration Decision* at 4 n.3; *Rehearing Decision* at 7. This comports with the CPUC's prior determination that § 703(b) must be read in conjunction with § 701, and that any call rated as a toll call within a local access and transport area is exchange access traffic. *In re Global NAPs, Inc.*, CPUC Decision No. 02-06-076, 2002 WL 31521502 at *5, *12-14 (June 27, 2002).

**[12]** This case is therefore not controlled by the *Virginia Arbitration Order*, where the FCC Wireline Competition Bureau considered whether to adopt Verizon's proposal to be compensated for transport of local calls to financial interconnection points outside the local calling area. *In re Petition of WorldCom, Inc.*, 17 F.C.C. Rcd. 27039, 2002 WL 1576912 (July 17, 2002) (*Virginia Arbitration Order*). The Bureau concluded that § 703(b) precludes originating carriers from charging transport for "local" traffic subject to federal reciprocal compensation. While similar in many respects, the *Virginia Arbitration Order* is critically different in that it was concerned with traffic that originates on the LEC's network and is subject to reciprocal compensation under federal law, whereas the CPUC found that VNXX calls are interexchange traffic that is not subject to the FCC's reciprocal compensa-

tion rules. That the CPUC did not deem VNXX traffic local for purposes of federal law also distinguishes this case from others relied upon by Pac-West, *Mountain Commc'ns, Inc. v. FCC*, 355 F.3d 644 (D.C. Cir. 2004); *MCImetro Access Transmission Servs, Inc. v. BellSouth Telecomms., Inc.,* 352 F.3d 872 (4th Cir. 2003); and *S.W. Bell Tel. Co. v. Pub. Utils Comm'n of Tex.*, 348 F.3d 482 (5th Cir. 2003). In each, the court overturned rulings that allowed collection of charges by an ILEC for traffic that originated and terminated in the same calling area and was deemed local for purposes of federal law. None required consideration of § 701 and its exceptions to § 703.

Pac-West further contends that the COC ruling is contrary to the *ISP Remand Order* which preempts state commissions from imposing any intercarrier compensation not provided for in the order. We disagree, as the *ISP Remand Order* was exclusively concerned with the operation of § 251(b)(5) of the Act and the imposition of reciprocal compensation charges on ISP-bound traffic. The order holds that ISP-bound traffic does not fall within § 251(b)(5), and so is not subject to the reciprocal compensation requirement. As the district court also noted, it addressed charges that may properly be imposed by the receiving carrier for receipt and handling of traffic, but does not govern charges imposed by the originating carrier for the delivery of VNXX traffic. Accordingly, this ruling has no effect on the determination of whether collection of call origination charges for ISP-bound VNXX traffic is appropriate. *See Global NAPs, Inc.*, 444 F.3d at 72 (holding that "the *ISP Remand Order* does not clearly preempt state authority to impose access charges for interexchange VNXX ISP-bound traffic").

For the same reason, the FCC's imposition of rate caps on ISP-bound traffic, and simultaneous preemption of state authority to address compensation for ISP-bound traffic, are not relevant. Those rate caps are intended to substitute for the reciprocal compensation that would otherwise be due to

CLECs for terminating local ISP-bound traffic. They do not affect the collection of charges by ILECs for originating interexchange ISP-bound traffic. As this issue was not before the FCC when it crafted the *ISP Remand Order*, the order does not preclude the CPUC's ruling.

Finally, Pac-West submits that the decision to allow call origination charges was not supported by substantial evidence, and was arbitrary and capricious, as the CPUC failed to cite any record evidence in support of its conclusion that Pac-West could distinguish VNXX from non-VNXX traffic for purposes of complying with the ruling. Pac-West posits that this conclusion is not only contrary to testimony in the record, but that it rests on the presumption that Pac-West *could* establish a means for separating VNXX from non-VNXX traffic in the future, thus implicitly conceding that no such means currently exist.

[13] The CPUC's conclusion that Pac-West is able to distinguish VNXX traffic from local traffic that is first transported long-distance to a Pac-West switch and then back to the original calling area rests on statements by Pac-West witnesses that "Pac-West knows where its network ends" and the call is picked up by the customer. Since that is the end of Pac-West's responsibility for the call, it should also be the relevant end point of the call for purposes of determining whether the call is local or VNXX. The record indicates that traffic studies are common in the industry and that Pac-West could conduct such studies to separate the calls that are not subject to reciprocal compensation but are subject to access charges. Other state commissions have reached similar conclusions,[5] so

---

[5]*See, e.g., AT&T Commc'ns of Ill., Inc. et al. Verified Petition for Arbitration*, 2003 Ill. PUC LEXIS 715, *288-89, *303-04 (Aug. 26, 2003); *In re Arbitration of the Interconnection Agreement Between Global NAPs and Verizon-Rhode Island*, 2002 R.I. PUC LEXIS 20, *49 (Oct. 16, 2002); *Petition of Global NAPs, Inc., Pursuant to Section 252(b) of the Telecomms. Act of 1996 for Arbitration to Establish an Interconnection Agreement with Verizon New Engl., Inc.*, 2002 Mass. PUC LEXIS 65, *49-54 (Dec. 12, 2002).

we cannot say that the CPUC's determination is without sup-
port.

### VII

We conclude that the CPUC's *Arbitration Decision* was not
arbitrary and capricious in determining that during the interim
period between a request to renegotiate an interconnection
agreement or after the contractual period for renegotiation has
run and adoption of a "new" agreement, the "old" agreement
continued in effect such that Verizon must pay reciprocal
compensation for delivery of internet-bound calls at pre-
existing rates rather than at the lower capped rates set by the
FCC that apply to new contractual obligations; that Pac-West
is entitled to reciprocal compensation for Virtual NXX traffic;
and that Verizon is entitled to collect call origination charges
for virtual traffic. We therefore affirm the district court's
judgment as to these issues. However, we also conclude that
the commission's determination that Pac-West could disre-
gard paging traffic for purposes of computing the presumptive
volume of ISP-bound traffic is incorrect. As to that issue, we
reverse and remand.

Each party shall bear its own costs.

AFFIRMED IN PART; REVERSED AND REMANDED,
IN PART.