In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 07-3557 & 07-3683

ILLINOIS BELL TELEPHONE COMPANY,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*


CHARLES E. BOX, *et al.*, Commissioners
of the Illinois Commerce Commission,

*Defendants-Appellees,*
*Cross-Appellants,*

and


ACCESS ONE, INC., *et al.*,

*Intervening Defendants-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 06 C 3550—**Virginia M. Kendall**, *Judge.*

_____

ARGUED MAY 6, 2008—DECIDED MAY 23, 2008

_____


Before EASTERBROOK, *Chief Judge*, and WOOD and
TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. The Telecommunications Act of 1996 directs established local phone companies—successors to the Bell Operating Companies that were subsidiaries of AT&T before its breakup in 1983—to lease parts of their networks to rivals on an à la carte basis. 47 U.S.C. §251(c)(3). Particular circuits or services, called unbundled network elements, must be furnished at a price, and under conditions, specified by the Federal Communications Commission. Its method of setting the price, called TELRIC (for total element long-run incremental cost), was approved by *Verizon Communications Inc. v. FCC*, 535 U.S. 467 (2002). That decision disapproved some of the FCC's views about which elements must be made available, however, and many questions remained open until the FCC's regulations in the wake of its third Triennial Review were approved by the D.C. Circuit. *Covad Communications Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006).

Today's case poses two questions about incumbents' obligations under the FCC's regulations. The first is whether these firms, called ILECs (for incumbent local exchange carriers), must allow their rivals, called CLECs (for competitive local exchange carriers), to use "entrance facilities" at TELRIC prices for interconnection (that is, transferring voice and data traffic from a CLEC's network to the ILEC's, and the reverse). The second is whether ILECs must lease fiber-optic circuits to deliver voice and data services to the CLECs' business customers. The 1996 Act provides that, when phone companies cannot agree on the answer to questions such as these, state public-utility commissions may decide. 47 U.S.C. §252(b). The statute misleadingly calls this process "arbitration," but it bears none of the features—such as voluntary consent,

a privately chosen adjudicator, and finality—that marks normal arbitration. See generally *AT&T Communications of Illinois, Inc. v. Illinois Bell Telephone Co.*, 349 F.3d 402 (7th Cir. 2003); *Mpower Communications Corp. v. Illinois Bell Telephone Co.*, 457 F.3d 625 (7th Cir. 2006). The state commission's decisions don't implement private agreements; they subject unwilling ILECs to public commands.

The Illinois Commerce Commission concluded that Illinois Bell, the ILEC in northern Illinois—which does business as AT&T following a series of corporate transactions that need not be recounted—must allow CLECs to use entrance facilities at TELRIC prices. It also concluded that AT&T must allow the CLECs to use its fiber-optic loops, except for service to "mass-market customers." The 1996 Act allows such decisions by state agencies to be reviewed by federal courts. See *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002). The district judge concluded that the state commission was right about entrance facilities and wrong about fiber-optic loops. See 2007 U.S. Dist. LEXIS 70551 (N.D. Ill. Sept. 21, 2007). AT&T has appealed on the entrance-facility issue; the commission has appealed on the local-loops issue.

An "entrance facility" is a connection between a switch maintained by an ILEC and a switch maintained by a CLEC. In other words, it is a means of transferring traffic from one carrier's network to another. The connection may be by copper cable, fiber-optic cable, or radio-frequency link. The connection may be long or short; multiple carriers' switches may even be in the same building (this is known as co-location). ILECs built entrance facilities to comply with their obligation to interchange traffic among networks. 47 U.S.C. §251(c)(2). Once

the links between ILECs and CLECs networks existed, CLECs began to use them to transport traffic from the customers of one CLEC to the customers of another, using the ILEC's circuits as intermediaries. A given CLEC also might route traffic among its own customers over the ILEC's network. Using an entrance facility to move voice or data traffic among CLEC customers has come to be known as "backhauling," though again the nomenclature is misleading: intra-CLEC traffic is related only loosely to loading freight on a truck, train, or boat at its destination for delivery to the vehicle's point of origin.

In the third Triennial Review Remand Order, the FCC concluded that CLECs do not need entrance facilities for backhauling and should build their own equipment for handling CLEC–to–CLEC traffic. ILECs need not provide unbundled network elements to CLECs that can serve customers without "impairment" through their own network elements. 47 U.S.C. §251(d)(2)(B). ("Impairment" is a complex concept that need not be explicated here.) No one contests the FCC's conclusion in this litigation.

What then of the original (and principal) use of an entrance facility: linking networks to allow CLEC–to–ILEC traffic (and ILEC–to–CLEC traffic)? The FCC stated:

> [O]ur finding of non-impairment with respect to entrance facilities does not alter the right of [CLECs] to obtain interconnection facilities pursuant to section 251(c)(2) for the transmission and routing of telephone exchange service and exchange access service. Thus, [CLECs] will have access to these facilities at cost-based rates to the extent that they require them to interconnect with the [ILEC's] network.

Triennial Review Remand Order at ¶140. The state commission relied on this passage when ordering AT&T to make entrance facilities available at TELRIC prices to CLECs for interconnection.

AT&T protests that this nullifies the FCC's order. What's the point of specifying that CLECs cannot demand access to entrance facilities as unbundled network elements, AT&T inquires, if state commissions can turn around and require the same access at the same price anyway? The answer, as the district court observed, is that CLECs do not enjoy the "same" access to entrance facilities under the state commission's decision as they did before the FCC's order. Until then CLECs could use entrance facilities for both interconnection and backhauling. Under the state's order, CLECs use entrance facilities exclusively for interconnection, just as the FCC said in ¶140. The state commission tells us that ILECs can detect and block any attempted use of an entrance facility for backhauling. (Every carrier, ILEC or CLEC, must be able to determine the traffic's destination in order to route it accurately.)

Section 251(c)(2) allows a CLEC to interconnect at any technologically feasible place. An entrance facility, designed for the very purpose of linking two carriers' networks, meets the requirement of feasibility, so a CLEC is entitled to hand off traffic to an ILEC at any entrance facility. The real dispute is not whether entrance facilities will be used for interconnection, but how much the ILEC can charge. Apparently AT&T has filed tariffs for the use of entrance facilities as interconnection gateways, and the tariffs specify prices exceeding the fee calculated according to TELRIC. AT&T wants to be able to charge the tariff price. Whether it can do so is not related to

the scope of an ILEC's obligations under §251(c)(3) to furnish unbundled network elements.

What the FCC said in ¶140 is that ILECs must allow use of entrance facilities for interconnection at "cost-based rates". TELRIC is a cost-based rate, though not the only one. We asked at oral argument whether anything in the 1996 Act or the FCC's regulations prohibits a state commission from using TELRIC to tell ILECs what they may charge for interconnection. Counsel for AT&T allowed that the state commission could do this. Well, that is effectively what the state commission *has* done. Instead of suspending AT&T's tariff for interconnection services and ordering a rate reduction, the state commission has reached the same result by an "arbitration" under the 1996 Act. If there is any objection to this procedure, it must rest on state rather than federal law. Whether the state commission has followed the requirements that Illinois imposes for overriding a utility's published tariff is of no consequence in this federal suit. It is enough for us to conclude that federal law permits a state agency to use the TELRIC method to regulate the price for the interconnection services that an ILEC must furnish under §251(c)(2).

On to optical fiber. The CLECs want, and the state commission ordered AT&T to provide, local loops that include optical fiber. A "local loop" is the set of wires and routing facilities needed to transmit a signal between a switch and a customer's premises. New entrants find local loops the most valuable unbundled network elements, because the switch-to-customer connection is the most costly to build from scratch. (A belief that the local loop was a natural monopoly was a principal reason for regulating the Bell Operating Companies in the

first place.) Regulations implementing the 1996 Act require ILECs such as AT&T to supply CLECs with local loops based on copper wire. More recently both ILECs and CLECs have added circuits based on optical fiber, which is cheaper than copper wire and can carry more traffic. Telecom firms may build new loops entirely from fiber; these are called "fiber to the home" or FTTH (whether "home" is a residence or an office). More commonly optical fiber is used to connect a switch to a junction near a home or office, and wire installed long ago carries the signal into the customer's premises; these loops are called "fiber to the curb" or FTTC. Finally, there are hybrid loops "composed of both fiber optic cable, usually in the feeder plant, and copper wire or cable". 47 C.F.R. §51.319(a)(2).

Federal regulations provide that ILECs need not provide optical loops to rival carriers, and, although hybrid loops must be supplied as unbundled network elements, the incumbents are entitled to restrict the use to which these may be put. 47 C.F.R. §51.319(a)(2), (3). The FCC found that CLECs' access to ILECs' loops based on traditional copper wire means that they are not "impaired" by lack of access to ILECs' loops based on optical fiber. Carriers are building new circuits using optical fiber; the FCC concluded that CLECs, no less than the ILECs, can and should do this for themselves. As long as CLECs rely on network elements supplied by ILECs, real competition is hampered; the ILECs' facilities continue to be monopolies and require regulation. See Graeme Guthrie, *Regulating Infrastructure: The Impact on Risk and Investment*, 44 J. Econ. Literature 925 (2006). One goal of the 1996 Acts' "impairment" clauses is to wean CLECs from reliance on unbundled network elements so that fully

competitive landline networks will be built, now that there is widespread agreement that local service is no longer a natural monopoly.

The state commission understood the FCC's regulation as limited to "mass-market customers" (which the state commission defined as those that use fewer than 4 phone circuits) and directed AT&T to furnish optical and hybrid local loops between central offices and all other customers to its rivals as unbundled network elements. The district court set this portion of the state commission's order aside, and sensibly.

Although the parties spend a good deal of time debating what the FCC "intended" by its regulation, it is enough to implement what the FCC said. The regulation as written is unqualified. It says that ILECs need not furnish optical-fiber local loops as unbundled network elements and may restrict the use to which CLECs put hybrid loops. Nothing turns on the customer's identity or the number of phone lines a given customer uses. Access to copper-based loops is available for all customers; that's why the FCC concluded that access to optical loops is not required to avoid impairment.

Commentary in the Triennial Review Order shows that the regulations mean what they say. The FCC wrote that, "in light of a competitive landscape in which [CLECs] are leading the deployment of [fiber to the home], removing unbundling obligations on [fiber to the home] loops will promote their deployment of the network infrastructure necessary to provide broadband services to the mass market." Order at ¶278. It added: "though our loop unbundling analysis focuses upon the customer classes most likely to be served by a specific type of loop, the unbundling rules we adopt apply with equal force to

every customer served by that loop type*." Id*. at ¶197 n.623. And it drove the point home at ¶210: "while we adopt loop unbundling rules specific to each loop type, our unbundling obligations and limitations for such loops do not vary based on the customer to be served." The state commission's order, which does make the obligation "vary based on the customer to be served", is preempted by the FCC's rules.

One final issue requires brief treatment. The district court implemented its decision by issuing an injunction. The state commission does not dispute the order's adequacy under Fed. R. Civ. P. 65(d) but does say that the district court should have used a kinder, gentler, remedy, such as a declaratory judgment. Perhaps this would be right—if this suit were an action for review of administrative action after the fashion of the Administrative Procedure Act. The 1996 Act authorizes judicial review of state agencies' decisions along the APA's lines. 47 U.S.C. §252(e)(6). But state agencies objected, saying that direct review would impinge on their sovereignty. The Supreme Court finessed that question in *Verizon Maryland* by holding that, whether or not §252(e)(6) properly authorizes suits against states or state agencies in their own names, state commissions' decisions may be reviewed indirectly in suits against commissioners, in their official capacity.

In other words, the Court concluded, *Ex parte Young*, 209 U.S. 123 (1908), comes to much the same end as §252(e)(6). Two things distinguish suits under *Ex parte Young* from direct review. First, the state and its agency are not named parties to the suit. Second, to ensure that the state is nonetheless bound by the decision, an injunction issues against state actors in their official capacities.

*Verizon Maryland* treated injunctions as the normal outcome of such proceedings, and declaratory judgments as permissible (but not required) supplements. 535 U.S. at 645–48. The state commission's members do not tell us why the court should proceed otherwise today; indeed, their brief does not even cite *Verizon Maryland*.

Illinois is free to waive its sovereign immunity and consent to litigation under §252(e)(6). If it does so, and the state (or its agency) becomes a formal party, then a district court should enter the same sort of judgment that would be appropriate in cases against federal agencies under the APA. As long as a state insists that the approach of *Ex parte Young* be used, however, an injunction is the normal remedy.

AFFIRMED