**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC BELL TELEPHONE COMPANY,
DBA AT&T California,
              *Plaintiff-Appellant,*

          v.

CALIFORNIA PUBLIC UTILITIES
COMMISSION; MICHAEL R. PEEVEY;
DIAN M. GRUENEICH; JOHN BOHN;
RACHELLE CHONG; TIMOTHY ALAN
SIMON,
              *Defendants-Appellees.*

No. 08-15568

D.C. No.
3:07-CV-01797-SI

PACIFIC BELL TELEPHONE COMPANY,
DBA AT&T California,
              *Plaintiff-Appellee,*

          v.

CALIFORNIA PUBLIC UTILITIES
COMMISSION; MICHAEL R. PEEVEY;
DIAN M. GRUENEICH; JOHN BOHN;
RACHELLE CHONG; TIMOTHY ALAN
SIMON,
              *Defendants,*

          and

CBEYOND COMMUNICATIONS, LLC,
    *Defendant-intervenor-Appellant.*

No. 08-15716

D.C. No.
07-CV-01797-SI

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

13159

Argued and Submitted
October 6, 2009—San Francisco, California

Filed March 4, 2010
Amended September 1, 2010

Before: Mary M. Schroeder, A. Wallace Tashima and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

---

## COUNSEL

Scott K. Attaway, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, for the plaintiff-appellant.

Frank R. Lindh, California Public Utilities Commission, San Francisco, California, for the defendants-appellees.

Clay Deanhardt, Law Office of Clay Deanhardt, Orinda, California, for the intervenor-appellant.

---

## ORDER

The opinion filed on March 4, 2010 is amended as follows:

**Replace the following text on Slip Op. page 3398:**

Both the Seventh and the Eighth circuits recently rejected AT&T's position, and have concluded that FCC regulations authorize state public utilities commissions to order incumbent LECs to lease entrance facilities to competitive LECs at regulated rates for the purpose of interconnection. *See Sw. Bell Tel., LP v. Mo. Pub. Serv. Comm'n*, 530 F.3d 676 (8th Cir. 2008) ("*SWBT*"); *Ill. Bell Tel. Co. v. Box*, 526 F.3d

1069 (7th Cir. 2008) ("*Box I*"). We agree with our sister circuits.

**With:**

Both the Seventh and the Eighth circuits recently rejected AT&T's position, and have concluded that FCC regulations authorize state public utilities commissions to order incumbent LECs to lease entrance facilities to competitive LECs at regulated rates for the purpose of interconnection. *See Sw. Bell Tel., LP v. Mo. Pub. Serv. Comm'n*, 530 F.3d 676 (8th Cir. 2008) ("*SWBT*"); *Ill. Bell Tel. Co. v. Box*, 526 F.3d 1069 (7th Cir. 2008) ("*Box I*");[11] *contra Michigan Bell Tel. Co. v. Lark*, 597 F.3d 370 (6th. Cir. 2010). For the reasons that follow, we agree with the Seventh and Eighth Circuits and reject the reasoning advanced by AT&T and the Sixth Circuit in its recent 2-1 decision.

Judges Schroeder and Bea vote to deny the suggestion for rehearing en banc, and Judge Tashima so recommends. All judges vote to deny the petition for panel rehearing.

The suggestion for rehearing en banc has been circulated to the full court, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35(b).

Petitioner's petition for panel rehearing and suggestion for rehearing en banc are denied.

No further filings will be accepted in this closed case.

---

**OPINION**

BEA, Circuit Judge:

This case involves the balance the Telecommunications Act of 1996 ("the Act") strikes between providing newer competi-

tors access to previously monopolistic telecommunications markets, on the one hand, and encouraging and protecting infrastructure investments of older, incumbent telecommunications providers on the other. We must interpret two provisions of the Act that impose requirements on older, incumbent local exchange carriers ("incumbent LECs")—like appellant AT&T—to lease certain components of their existing infrastructure to rival newer, competitive carriers ("competitive LECs")—like intervenor Cbeyond.

First, we must determine whether 47 U.S.C. § 251(c)(2) requires an incumbent LEC to lease its "entrance facilities" (wires that connect rival telephone systems) to a competitive LEC at regulated rates when the competitor wishes to use the "entrance facility" to permit its own customers to reach customers of the incumbent LEC.

Second, we must determine whether 47 C.F.R. § 51.319(e)(2)(ii)(B) (the "DS1 Cap Rule"), which limits to ten the number of low-capacity DS1 telephone lines an incumbent LEC must lease to a competitive LEC at regulated (low) rates along certain routes, is a limitation which also applies to any route, regardless whether the competitive LEC is "impaired" as to the alternative to such low-capacity lines: the competitive LEC's own higher-capacity DS3 lines.

Properly to understand the terms used and the regulatory area into which we are about, some background would help.

## BACKGROUND

### A.   The Telecommunications Act of 1996

Prior to 1996, local telephone service generally was provided by a local monopolist who offered services at prices regulated and imposed by a variety of governmental agencies. Such monopolist providers are commonly referred to as "incumbent local exchange carriers" or "incumbent LECs." Con-

gress enacted the Act to deregulate the telecommunications market. *See generally Verizon Comms. Inc. v. FCC*, 535 U.S. 467, 475-76 (2002). But, to facilitate the entry of new participants into these local markets, the Act imposes on incumbent LECs two duties relevant in this case.

*Interconnection Duty at Regulated Rates.*

First, the Act imposes a duty on incumbent LECs to permit "interconnection." Pursuant to 47 U.S.C. § 251(c)(2),[1] incumbent LECs must allow the competitive LEC to link its network to that of the incumbent LEC, so that customers of the competitive LEC may place calls to customers of the incumbent LEC. Without the ability to link its network to that of the incumbent LEC, the competitive LEC would have little prospect of selling its telephone services, to say nothing of competing for the customers of the incumbent LEC. A local telephone service is of little use if it cannot connect to other local telephone users.

*Lease of Network Parts at Regulated Rates.*

Second, the Act imposes a duty that incumbent LECs "unbundle"[2] parts of their network. Each such part of the incumbent LEC's network is a "network element". Pursuant to 47 U.S.C. § 251(c)(3),[3] incumbent LECs must permit competi-

---

[1]47 U.S.C. § 251(c)(2) provides that each incumbent LEC has "the duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network."

[2]"Unbundling" is the process of breaking apart something into smaller parts. An example is taking a bundled computer system and unbundling it into its individual pieces such as the PC unit, monitor, keyboard, and mouse, and then selling each of these items individually. In the context of this case, "unbundling" is the term used to describe the access provided by incumbent LECs so that other service providers (i.e., competitive LECs) can buy or lease portions of the incumbent LECs' network elements, such as interconnection loops, to serve subscribers.

[3]47 U.S.C. § 251(c)(3) provides that incumbent LEC's have: "The duty to provide, to any requesting telecommunications carrier for the provision

tive LECs to lease, at regulated cost-based rates, parts of the incumbent's network, such as telephone wires, call exchanges, and routing systems. This provision promotes competition by allowing a competitive LEC to enter the telephone service market without having first to overcome capital barriers to entry, i.e., without having to construct, at high cost, every component necessary to operate a network. *See Ill. Bell Tel. Co. v. Box*, 548 F.3d 607, 609-10 (7th Cir. 2008) ("*Box II*"). For example, a competitive LEC might enter a market by providing residential telephone service in two far-flung neighborhoods. Rather than having to lay its own wire to connect the two neighborhoods, the competitive LEC can, under § 251(c)(3), piggyback on the incumbent LEC's pre-existing network at regulated, cost-based rates. In this way, a competitive LEC may more easily and less expensively begin to establish its market presence.

However, before an incumbent LEC is obligated to lease network elements on an unbundled basis, the Federal Communications Commission ("FCC") must find that a refusal to deal would "impair" competition. Section 251(d)(2) requires the FCC to determine which network elements incumbent LECs must offer to a competitive LEC on an unbundled basis. 47 U.S.C. § 251(d)(2).

Once the FCC determines that a particular network element must be offered on an unbundled basis, a competitive LEC that wishes to lease the network element must negotiate with

_____

of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement [negotiated in good faith by the incumbent LEC and competitive LEC pursuant to § 251(c)(1)] and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service."

the incumbent LEC to determine price and other terms. 47 U.S.C. § 251(c)(1). If the negotiations come to an impasse or otherwise fail to produce and agreement, the parties must submit the dispute to binding arbitration.[4] The arbitrator's decision is subject to approval by the relevant state regulatory commission, usually the state public utilities commission. *Id.* If the parties have failed to agree on the lease price, the state regulatory commission may set a price that is "just and reasonable." *Id.* § 252(d)(1).

These "just and reasonable" rates must be based upon the Total Element Long Run Incremental Cost ("TELRIC") methodology. 47 C.F.R. § 51.505. The TELRIC methodology is based on what it cost the incumbent LEC to acquire the network elements; this historical cost method often results in prices that, under certain circumstances, can be highly favorable to the competitive LECs. *See Verizon Communications*, 535 U.S. at 489, 496-97 (upholding 47 C.F.R. § 51.505); *Box II*, 548 F.3d at 609.

The FCC's attempts to implement the incumbent LEC's unbundling obligations have a long history. The first three published rules were invalidated by the courts, in part,[5] and it was not until the FCC issued the Triennial Review Remand Order in 2005 (the "TRRO"), Order on Remand, *In the Matter of Unbundled Access to Network Elements: Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 20 F.C.C.R. 2533 (Feb. 4, 2005), that the FCC's rules survived judicial review, *see Covad Comms. Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006). Two predecessor orders, the relevant parts of which were not invalidated by

---

[4]As the Seventh Circuit has noted, the "arbitration" is really the first stage in a regulatory proceeding, for it bears none of the traditional hallmarks of normal arbitration such as voluntary consent and finality. *See Ill. Bell Tel. Co. v. Box*, 526 F.3d 1069, 1070 (7th Cir. 2008) ("*Box I*").

[5]*See Covad Comms. Co. v. FCC*, 450 F.3d 528, 533-534 (D.C. Cir. 2006) (describing history of invalidated FCC unbundling orders).

courts, are relevant to our analysis and are discussed in greater detail below: the 2003 Triennial Review Order (the "TRO"),[6] and the 1996 Local Competition Order (the "LCO").[7]

## B.   Procedural History

After the FCC issued the TRRO, AT&T—the incumbent LEC in California—sought to negotiate changes to its agreements with competitive LECs to bring their contracts into conformity with AT&T's now-changed obligations. After negotiations broke down, AT&T brought a consolidated arbitration proceeding before the California Public Utilities Commission ("CPUC"). CPUC issued a decision favoring the competitive LECs on several disputed issues, and AT&T filed an action in federal district court seeking to set aside four of CPUC's orders related to unbundling. Two of these orders are at issue on appeal:

1.   *Entrance Facilities*—CPUC ordered AT&T to lease entrance facilities to competitor LECs at TELRIC rates for the purpose of interconnection. An entrance facility is a "dedicated transport" (a wire) that connects one LEC's "switch" (a computer that routes calls) to another LEC's switch. In other words, an entrance facility is the high capacity wire that links telephone networks. Entrance facilities may be used for two distinct purposes. First, a competitive LEC can use an entrance facility for interconnection—that is, to link the competitive LEC's network with that of the incumbent LEC so that the competitive LEC's customers may reach the incumbent LEC's customers. *See* TRRO ¶ 138-40; TRO ¶ 366-67.

---

[6]Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, *Review of the Section 251 Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16978 (2003), *vacated in part by United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004).

[7]First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499 (1996) (subsequent history omitted).

Second, a competitive LEC can use an entrance facility for what the industry calls "backhauling." In the case of backhauling, the competitive LEC uses the entrance facility to permit its *own* customers to reach *one another* over the incumbent LECs network. *See id.*[8] The following diagram illustrates the difference between interconnection and backhauling:



Under the TRRO, incumbent LECs are not obligated to offer entrance facilities on an unbundled basis under 47 U.S.C. § 251(c)*(3)*. AT&T and the competitive LECs disputed, however, whether § 251(c)*(2)* obligates incumbent LECs to lease their entrance facilities to competitive LECs at TELRIC rates for the purposes of "interconnection" (*i.e.*, for the purpose of allowing competitive LEC customers to place

---

[8]Incumbent LECs are capable of screening out calls that would be used for backhauling. A computer identifies the destination of the call, and, if the call is bound for a customer of the competitive LEC, the computer can screen out the call.

calls to incumbent LEC customers). CPUC concluded that § 251(c)(2) requires incumbent LECs to lease entrance facilities to competitive LECs at TELRIC rates for interconnection. On cross motions for summary judgment, the district court confirmed CPUC's arbitral order on this point, and AT&T timely appealed.

2. *DS1 Transport*—CPUC also ruled that the DS1 Cap Rule applies only on routes where competitive LECs are not "impaired"[9] as to DS3 transport circuits. A "transport circuit" is a wire that carries telecommunications signals along "routes" between switching centers (computers that direct calls to other locations). TRRO ¶ 67. Transport circuits come in two grades relevant here: DS1 (low capacity) and DS3 (high capacity). A DS3 line can carry twenty-four times as many calls as a DS1 line but is more expensive to buy and install than DS1 lines. TRRO ¶ 129 n. 361. All parties agree that the FCC's rules cap the number of DS1 circuits competitive LECs may lease from incumbent LECs on an unbundled basis along routes where competitive LECs are not "impaired" as to higher capacity DS3 lines. Once a competitive LEC has sufficient traffic to justify leasing ten or more DS1 lines, it is economical for the competitive LEC to build, deploy, and install its own DS3 line. TRRO ¶¶ 71-73.

However, AT&T and the competitive LECs disputed whether this cap also applies to routes where the FCC had concluded that competitive LECs were "impaired" as to higher capacity DS3 lines. CPUC ruled in favor of the competitive LECs, and held that the cap did not apply along such

---

[9]According to FCC regulations, a competitive LEC's ability to provide service is " 'impaired' if, taking into consideration the availability of alternative elements outside the incumbent LEC's network, including elements self-provisioned by the requesting carrier or acquired as an alternative from a third-party supplier, lack of access to that element poses a barrier or barriers to entry, including operational and economic barriers, that are likely to make entry into a market by a reasonably efficient competitor uneconomic." 47 C.F.R. § 51.317(b).

"DS3-impaired" routes. The district court disagreed, concluding that, under the plain language of the FCC's rule, the DS1 Cap applies along all routes, and vacated the arbitral order on this point. Cbeyond filed a motion in the district court to join the action as an intervenor for the purpose of appeal.

## ANALYSIS

This court reviews *de novo* claims of error in a district court's order determining whether an arbitrator's decision complies with FCC regulations. *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1150 (9th Cir. 2006). This court owes no deference to the arbitrator's decision. *Id.* The parties may not challenge the validity of any final order of the FCC, including FCC regulations, in this action. 28 U.S.C. § 2342.[10]

### A. Access to Entrance Facilities Under 47 U.S.C. § 251(c)(2).

[1] AT&T contends the district court erred by affirming the CPUC's arbitral order permitting competitive LECs to lease entrance facilities from incumbent LECs under 47 U.S.C. § 251(c)(2), the interconnection provision. Both the Seventh and the Eighth circuits recently rejected AT&T's position, and have concluded that FCC regulations authorize state public utilities commissions to order incumbent LECs to

---

[10]Under the Hobbs Act, this court lacks jurisdiction to rule on a collateral attack of an FCC order. 28 U.S.C. § 2342; *see also US West Comms, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002) ("Properly promulgated FCC regulations currently in effect must be presumed valid for the purposes of this appeal. The Hobbs Act, 28 U.S.C. § 2342, requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals. The district court thus lacked jurisdiction to pass on the validity of the FCC regulations, and no question as to their validity can be before us in this appeal."); *see also GTE S., Inc. v. Morrison*, 199 F.3d 733, 742-43 (4th Cir. 1999) (holding the court lacked jurisdiction to rule on the validity of FCC rules "including those relating to rulemaking" on review of district court order affirming state public utility's arbitral decision relating to provisions of the Act).

lease entrance facilities to competitive LECs at regulated rates for the purpose of interconnection. *See Sw. Bell Tel., LP v. Mo. Pub. Serv. Comm'n*, 530 F.3d 676 (8th Cir. 2008) ("*SWBT*"); *Ill. Bell Tel. Co. v. Box*, 526 F.3d 1069 (7th Cir. 2008) ("*Box I*");[11] *contra Michigan Bell Tel. Co. v. Lark*, 597 F.3d 370 (6th. Cir. 2010). For the reasons that follow, we agree with the Seventh and Eighth Circuits and reject the reasoning advanced by AT&T and the Sixth Circuit in its recent 2-1 decision.

**[2]** Section 251(c)(2) provides that "each incumbent local exchange carrier has the . . . duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network." 47 U.S.C. § 251(c)(2). The FCC defines interconnection as "the linking of two networks for the mutual exchange of traffic." 47 C.F.R. § 51.5. In other words, interconnection provides a way for a competitive LEC's customers to reach AT&T's customers and vice versa. Section 251(c)(2)(B) specifies that incumbent LECs must offer competitive LECs such interconnection "at any technically feasible point within the [incumbent] carrier's network." 47 U.S.C. § 251(c)(2)(B). The FCC regulation also states that incumbent LECs must provide competitive LECs with "any technically feasible method of obtaining interconnection." 47 C.F.R. § 51.321(a).

**[3]** The FCC calls entrance facilities "the transmission facilities that connect competitive LEC networks with incumbent LEC networks." TRRO ¶ 136. As the term "entrance"

---

[11]In *Box I*, the Seventh Circuit held that because entrance facilities were a "technologically feasible" means of handing off traffic between a competitive LEC and an incumbent LEC, an obligation to lease such facilities at TELRIC rates was within the scope of § 251(c)(2) and the implementing regulations. 526 F.3d at 1071-72. The Eighth Circuit reached the same conclusion in *SWBT*, 530 F.3d at 683-84. In *SWBT*, the Eighth Circuit stated: "If a [competitive] LEC needs entrance facilities to interconnect with an [incumbent] LEC's network, it has the right to obtain such facilities from the [incumbent] LEC." *Id.* at 684.

implies, entrance facilities provide a way for a competitive LEC's calls to enter AT&T's network and reach AT&T customers, a fact that AT&T concedes. For the competitive LECs to use the entrance facilities this way is interconnection.[12]

[4] That AT&T's entrance facilities can be used for a purpose besides interconnection (i.e., backhauling) does not change the result that 47 U.S.C. § 251(c)(2) mandates AT&T to provide competitive LECs access at regulated rates to its entrance facilities for *interconnection*. The parties disagree about the effect on this result of the FCC's finding in its TRRO that under a different subsection of the Act, § 251(c)*(3)*,[13] competitive LECs are not impaired[14] in building entrance

---

[12]AT&T seeks to distinguish the historical use of entrance facilities for interconnection by long distance service providers, which did not compete with AT&T, and the current use by competitive LECs, which do compete with AT&T. AT&T states that "entrance facilities in this case provides the same function" as entrance facilities did historically (*i.e.*, connecting networks), but competitive LECs can feasibly interconnect with AT&T at a different point in AT&T's network, whereas the long distance providers could not. This contention does not survive the plain language of § 251(c)(2)(B), which requires an incumbent LEC to provide interconnection "at *any* technically feasible point within [its] network." (Emphasis added.)

[13]Section 251(c)(3) provides that incumbent LECs have "[t]he duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service."

[14]The Act tasks the FCC with deciding whether a particular network element, i.e., "a facility or equipment used in the provision of a telecommunications service," 47 U.S.C. § 153(29), is one that incumbent LECs must lease to competitive LECs at regulated rates, i.e., the element is "unbundled" under 47 U.S.C. § 251(c)(3). 47 U.S.C. § 251(d). To make that determination, the FCC must consider, at a minimum, two factors:

facilities and therefore that entrance facilities are not "unbundled network elements" that incumbent LECs like AT&T have a duty to provide competitive LECs *for any purpose*, including backhauling. TRRO ¶¶ 136-141.

As an initial matter, under general principles of statutory interpretation, the specific duty found in 47 U.S.C. § 251(c)(2) of providing interconnection facilities prevails over the general duty of providing network elements at unbundled rates, found in § 251(c)(3) (regardless whether that general unbundling duty exists as to entrance facilities). *See NLRB v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1415 (9th Cir. 1994) ("It is a well-settled canon of statutory interpretation that specific provisions prevail over general provisions.").

Moreover, as the district court found, the TRRO reinforces that the duties of incumbent LECs under 47 U.S.C. § 251(c)(2) and § 251(c)(3) are independent. The TRRO states that the FCC's finding that incumbent LECs need not lease entrance facilities as unbundled network elements under (c)(3) "does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2)." TRRO ¶ 140.

**[5]** AT&T contends TRRO Paragraph 140 does not require incumbent LECs to offer entrance facilities at TELRIC rates because the TRRO uses the term "interconnection facilities" instead of "entrance facilities" when it refers to the right under 47 U.S.C. § 251(c)(2) that is not altered by the TRRO's determination that "entrance facilities" need not be unbundled under § 251(c)(3). First, although the FCC did not use the

"whether — (A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." *Id.* The FCC thus makes an "impairment finding" as to that network element. *See Covad Comms.*, 450 F.3d at 534-45.

term "entrance facilities" in Paragraph 140, the paragraph appears in a section of the TRRO entitled "Entrance Facilities," which solely discusses the effect of the FCC's finding as to entrance facilities. Moreover, prior FCC rulings make clear that the interconnection obligation contained in § 251(c)(2) includes a duty to lease entrance facilities at TELRIC rates when such facilities will be used for the purposes of interconnection. The 1996 Local Competition Order ("LCO") broadly defined the interconnection obligation to include a duty to offer unbundled network elements at TELRIC rates:

> We conclude that, under sections 251(c)(2) *and* 251(c)(3), any requesting carrier may choose *any method of technically feasible interconnection* or access to unbundled elements at a particular point. Section 251(c)(2) imposes an interconnection duty at any technically feasible point; *it does not limit that duty* to a specific method of interconnection or *access to unbundled elements*.

LCO ¶ 549 (emphasis added); *see also* 47 C.F.R. § 51.321(a) (stating that incumbent LECs are required to offer "any technically feasible method of obtaining interconnection").

**[6]** Though the LCO did not expressly state that entrance facilities were one of the "network elements" incumbent LECs were required to make available under 47 U.S.C. § 251(c)(2), the later Triennial Review Order ("TRO") expressly interpreted the LCO to impose this obligation. The TRO stated:

> In reaching [the determination that entrance facilities are not "network elements" subject to the unbundling obligation in § 251(c)(3)] we note that, to the extent that requesting carriers need facilities in order to 'interconnect with the incumbent LEC's network,' section 251(c)(2) of the Act *expressly provides for*

*this* and we do not alter the Commission's interpretation of this obligation.

TRO ¶ 365. The TRO elaborated:

> [C]ompetitive LECs often use transmission links including unbundled transport connecting incumbent LEC switches or wire centers in order to carry traffic to and from its end users. These links constitute the incumbent LEC's own transport network. However, in order to access UNEs [unbundled network elements], including transmission between incumbent LEC switches or wire centers, while providing their own switching and other equipment, competitive LECs require a transmission link from the UNEs on the incumbent LEC network to their own equipment located elsewhere. Competitive LECs use these transmission connections between incumbent LEC networks and their own networks both for interconnection and to backhaul traffic. Unlike the facilities that incumbent LECs explicitly must make available for section 251(c)(2) interconnection, we find that the Act does not require incumbent LECs to unbundle transmission facilities connecting incumbent LEC networks to competitive LEC networks for the purpose of backhauling traffic.

TRO ¶ 366. The TRO thus expressly interpreted the LCO to allow competitive LECs to lease entrance facilities or "transmission links" at TELRIC rates for the purpose of achieving interconnection. This interpretation of the LCO is reasonable and entitled to deference.[15] *Auer v. Robbins*, 519 U.S. 452,

---

[15]Contrary to AT&T's assertion, this portion of the TRO was not vacated in *USTA II*, 359 F.3d 554. *USTA II* vacated only the TRO's conclusion that entrance facilities are categorically excluded from the definition of "network elements" under § 251(c)(3). *Id.* at 585. The court did not rule on the validity of the FCC's conclusion that, under § 251(c)(2), incumbent LECs are obligated to offer entrance facilities at TELRIC rates.

461 (1997) (An agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation.").[16] Moreover, AT&T's contention that the TRO's interpretation of the LCO conflicts with the terms of 47 U.S.C. § 251(c)(2) is foreclosed because AT&T cannot challenge the validity of FCC orders in this proceeding. *See Jennings*, 304 F.3d at 958 n.2.

AT&T also contends CPUC's interpretation conflicts with the FCC's express findings that competitive LECs are not "impaired" as to entrance facilities. *See* TRRO ¶¶ 138, 139. But those FCC findings also expressly distinguished entrance facilities used for the purpose of interconnection and for backhauling. TRRO ¶¶ 138-140. In light of the different economic considerations associated with the use of entrance facilities for interconnection, on the one hand, and for backhaul, on the other, the FCC could reasonably conclude that different regulations were appropriate. Where a competitive LEC uses an interconnection facility for backhaul, only the competitive LEC benefits—both the originator and the recipient of the call are competitive LEC customers. But when the competitive LEC uses the entrance facility for interconnection, both competitor and incumbent benefit: the incumbent's customers can reach customers of the competitor, and vice versa. *See generally* LCO ¶ 162 ("In this situation . . . each gains value from

---

[16]The specific statements in the TRO and the LCO that the obligation to provide facilities and equipment under § 251(c)(2) includes a duty to provide entrance facilities foreclose AT&T's interpretation of the term "interconnection facilities." AT&T relies on 47 C.F.R. § 51.5, which defines "interconnection" to exclude the "transport and termination of traffic." AT&T construes this language to exclude *any* duty under § 251(c)(2) to carry a competitive LEC's traffic. This conflicts with TRRO ¶ 140 itself, which explains that "interconnection facilities" are "for transmission and routing" of telephone calls. If the duty to provide "interconnection" did not include any duty to provide *any* transport of calls, then § 251(c)(2) would be meaningless because incumbents could physically link networks with the competitive LEC, but refuse to carry calls to the incumbent LEC's terminal customers, thus effectively locking the competitive LEC out of the market.

the interconnection arrangement."); TRO ¶ 367 ("Our conclusion in this respect is buttressed by the fact that the economics of dedicated facilities used for backhaul between networks are sufficiently different from transport within an incumbent LEC's network that our analysis must adequately reflect this distinction."); *see also Box I*, 526 F.3d at 1071 ("What's the point of specifying that [competitive] LECs cannot demand access to entrance facilities as unbundled network elements, AT&T inquires, if state commissions can turn around and require the same access at the same price anyway? The answer . . . is that [competitive] LECs do not enjoy the "same" access to entrance facilities under the state commission's decision as they did before the FCC's order. Until then, [competitive] LECs could use entrance facilities for both interconnection and backhauling.").

**[7]** Accordingly, we agree with the district court and hold that, under 47 U.S.C. § 251(c)(2), incumbent LECs must lease entrance facilities at TELRIC rates to competitive LECs for the purpose of interconnection.

## B. Unbundled Access to DS1 Circuits Under 47 U.S.C. § 251(c)(3).

**[8]** In its cross-appeal, Cbeyond contends the district court erred in vacating the CPUC's order that required incumbent LECs to grant unbundled access to an unlimited number of DS1 transport circuits along routes on which competitive LECs are impaired as to DS3 transport circuits.[17] The district

---

[17]AT&T incorrectly contends Cbeyond waived this issue by failing to raise it in the district court. This issue is (1) a pure question of law; and (2) was fully briefed in the district court by the CPUC. Accordingly, the issue has not been raised for the first time on appeal and this court can reach the issue. Even if the issue was presented for the first time on appeal, the court could reach the question. *See K&N Eng., Inc. v. Bulat*, 510 F.3d 1079, 1081 n.2 (9th Cir. 2007) (the court may, in its discretion, reach issues raised for the first time on appeal if the record is fully developed, the question is a pure question of law, and no prejudice will result).

court concluded that the plain language of the governing regulation, 47 C.F.R. § 51.319(e)(2)(ii)(B) (the "DS1 Cap Rule"),**[18]** limits a competitive LEC to a maximum of ten DS1 circuits along any route regardless whether the competitive LEC is impaired as to DS3 lines. We agree. Under the plain language of the regulation, the DS1 Cap Rule applies to *all* routes where DS1 circuits are available on an unbundled basis.

On appeal, Cbeyond contends the district court's interpretation of the DS1 Cap Rule is contrary to the FCC's findings in the earlier TRRO. Cbeyond concedes, however, that the language of the DS1 Cap Rule—47 C.F.R. § 51.319(e)(2)(ii)(B) —unambiguously limits to ten the number of DS1 circuits an incumbent LEC must offer at TELRIC rates on *any* route.

In general, the plain meaning of an administrative regulation controls. *Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078, 1084 (9th Cir. 2007). Plain meaning, however, is "not the end of the inquiry." *Id.* at 1086; *see also Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1097 (9th Cir. 2007). The plain language of a regulation does not control if "clearly expressed administrative intent is to the contrary or if such plain meaning would lead to absurd results." *Id.* (internal quotation marks and alterations omitted). "[T]he regulatory intent that overcomes plain language must be referenced in the published notices that accompanied the rulemaking process." *Id.* A rule leads to absurd results only if it would be "patently inconceivable" that the agency intended the result. *Id.* at 1098.

**[9]** Here, there is no "clearly expressed administrative intent" in the published notices that accompanied the DS1 Cap Rule rulemaking process. Further, the DS1 Cap Rule as we read its plain text would not lead to absurd results. It is

---

**[18]**The DS1 Cap Rule provides: "Cap on unbundled DS1 transport circuits. A requesting telecommunications carrier may obtain a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis."

perfectly conceivable the FCC meant what it said when it limited the number of DS1 circuits that a competitive LEC can lease on routes where the competitive LEC is impaired as to a higher capacity DS3 circuit. Where a competitive LEC is so impaired, it will have access to an incumbent's DS3 circuits on an unbundled basis. Hence, it would be more economical for the competitive LEC to lease a single DS3 line from the incumbent LEC, rather than eleven or more DS1 lines at greater cost. TRRO ¶ 128 ("This is consistent with the pricing efficiencies of aggregating traffic. While a DS3 circuit is capable of carrying 28 uncompressed DS1 channels, the record reveals that it is efficient for a carrier to aggregate traffic at approximately 10 DS1s."). The FCC expressly found that once a competitive LEC could aggregate sufficient traffic, the DS3 rules should apply: "When a carrier aggregates sufficient traffic on DS1 facilities such that it effectively could use a DS3 facility, we find that our DS3 impairment conclusions should apply." *Id.*

**[10]** It is hardly "patently inconceivable" that the FCC intended the DS1 cap to apply on all routes, even those where competitive LECs are impaired as to DS3 circuits. In such circumstance, the competitive LEC can obtain more economical DS3 circuits, and there is no reason why the FCC would have intended to permit competitive LECs to impose greater costs on incumbent LECs by allowing unlimited leases of DS1 circuits.

Cbeyond's contention that the DS1 Cap Rule conflicts with the terms of 47 U.S.C. § 251(c)(3) is foreclosed because Cbeyond cannot challenge the validity of the FCC orders in this proceeding. *See Jennings*, 304 F.3d at 958 n.2.

**[11]** Accordingly, we agree with the district court and hold that, under the plain language of the regulation, the DS1 Cap Rule limits to ten the number of DS1 lines an incumbent LEC must lease to a competitive LEC at TELRIC rates on all routes.

# CONCLUSION

For the all of the foregoing reasons, we affirm the district court's order confirming in part and vacating in part the CPUC's arbitral order.

**AFFIRMED.**