**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AUTOTEL, a Nevada corporation,
        *Plaintiff-Appellant,*

v.

NEVADA BELL TELEPHONE COMPANY,
DBA AT&T of Nevada, FKA
SBC,
        *Defendant-Appellee.*

No. 10-15663

D.C. No.
2:07-cv-01423-
ECR-GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, Senior District Judge, Presiding

Argued and Submitted
August 29, 2011—San Francisco, California

Filed September 4, 2012

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and Otis D. Wright, II, District Judge.*

Opinion by Judge Fisher

*The Honorable Otis D. Wright, II, United States District Judge for the Central District of California, sitting by designation.

**COUNSEL**

Marianne Dugan, Eugene, Oregon, for the plaintiff-appellant.

Roger A. Moffitt, AT&T Nevada, Reno, Nevada; Dennis G. Friedman (argued) and James C. Schroeder, Mayer Brown LLP, Chicago, Illinois, for the defendant-appellee.

**OPINION**

FISHER, Circuit Judge:

This case arises out of a dispute between two telecommunications carriers. Plaintiff-Appellant Autotel is a Commercial Mobile Radio Service (CMRS) provider wishing to provide wireless service in and around Pahrump, Nevada. It seeks digital interconnection with the facilities and equipment of Defendant-Appellee Nevada Bell Telephone Co. (AT&T Nevada), the incumbent local exchange carrier (LEC) in the area. After the parties' efforts to negotiate an interconnection agreement failed, Autotel brought suit in federal court, alleging that AT&T Nevada violated the Telecommunications Act of 1996 by (1) refusing to negotiate in good faith; and (2) failing to provide digital interconnection with symmetrical pricing on an interim basis during negotiations, as required by Federal Communications Commission (FCC) regulations.

The district court dismissed Autotel's first cause of action and granted summary judgment to AT&T Nevada on Auto-

tel's second cause of action. Autotel appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

We hold that the district court properly dismissed Autotel's good faith claim because Autotel did not exhaust its administrative remedies under our circuit's prudential exhaustion requirement. Instead, Autotel appeals from the state public utilities commission's summary dismissal of its complaint as procedurally deficient without addressing its merits. With respect to Autotel's second cause of action, we hold that the interim arrangement and symmetrical pricing requirements described in 47 C.F.R. §§ 51.715 and 20.11(e) apply only when the competing carrier does not have an existing interconnection arrangement with the incumbent LEC that provides for the transport and termination of telecommunications traffic. Because Autotel had such an arrangement with AT&T Nevada at all relevant times, AT&T Nevada had no obligation to provide Autotel an interim arrangement with symmeterical rates.

We remand, however, to permit the district court to consider what, if any, relief is available to Autotel under 47 C.F.R. § 51.717.

## BACKGROUND

The Telecommunications Act of 1996 ("the 1996 Act"), Pub. L. No. 104-104, 110 Stat. 56 (1996), "introduced a competitive regime for local telecommunications services[,]" *W. Radio Servs. Co. v. Qwest Corp.* (*Western Radio I*), 530 F.3d 1186, 1190 (9th Cir. 2008). Before its passage, a single company within each local area typically provided local telephone service pursuant to a state-sanctioned monopoly. *See Verizon California, Inc. v. Peevey*, 462 F.3d 1142, 1146 (9th Cir. 2006). To encourage competition, the 1996 Act imposed on incumbent LECs, such as AT&T Nevada, the duty to provide interconnection to competing telecommunications carriers, such as Autotel. *See* 47 U.S.C. § 251(c)(2). Interconnection is

the "physical act of linking one network to another through facilities and equipment." *W. Radio Servs. Co. v. Qwest Corp.* (*Western Radio II*), 678 F.3d 970, 986 (9th Cir. 2012) (emphasis, citations and internal quotations marks omitted). It "allows customers of one LEC to call the customers of another, with the calling party's LEC (the 'originating' carrier) transporting the call to the connection point, where the called party's LEC (the 'terminating' carrier) takes over and transports the call to its end point." *Verizon California*, 462 F.3d at 1146.

The 1996 Act adopted several substantive requirements relating to the quality and nature of the interconnection. For example, an incumbent LEC must provide interconnection "at any technically feasible point within [its] network" that is "at least equal in quality to that provided by the local exchange carrier to itself." 47 U.S.C. § 251(c)(2)(B), (C). In addition, interconnecting carriers must "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). "Under a reciprocal compensation arrangement, the originating LEC must compensate the terminating LEC for delivering its customer's call to the end point." *Verizon California*, 462 F.3d at 1146.[1]

If a carrier requests interconnection, both parties have a "duty to negotiate in good faith . . . the particular terms and conditions of" an interconnection agreement. 47 U.S.C. § 251(c)(1). The 1996 Act sets forth a procedural framework for these negotiations. An incumbent LEC and a requesting carrier may negotiate a voluntary agreement, and either party

---

[1]The FCC has determined that this reciprocal compensation requirement applies only 'to traffic that originates and terminates within a local area.' " *Verizon California*, 462 F.3d at 1146 (quoting *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996* (*Local Competition Order*), 11 FCC Rcd. 15499, 16013, ¶ 1034 (Aug. 8, 1996) (subsequent history omitted)). The parties do not address this limitation, and it appears from the record that their dispute centers around Autotel's provision of local service.

may ask a state public utilities commission (PUC) to "mediate any differences arising in the course of the negotiation." 47 U.S.C. § 252(a). If the parties fail to reach a complete agreement through voluntary negotiations or mediation, either party may petition the state PUC to resolve the open issues through compulsory arbitration. *See* 47 U.S.C. § 252(b).

Autotel first interconnected with AT&T Nevada's network in 1994 through five analog loops connecting to the AT&T Nevada switch in Pahrump, Nevada. AT&T Nevada charged Autotel a flat monthly fee pursuant to AT&T Nevada's standard retail tariff for such lines.

In August 1996, Autotel requested digital interconnection with AT&T Nevada's network pursuant to §§ 251 and 252 of the 1996 Act. Voluntary negotiations were unsuccessful, and in August 2002, Autotel filed a petition with the Public Utilities Commission of Nevada (PUCN) seeking arbitration of an interconnection agreement. After nearly two years, the PUCN dismissed Autotel's petition. It found that Autotel had failed to comply with the PUCN's discovery procedures and orders, and thus had violated its duty to negotiate in good faith. *See* 47 U.S.C. § 252(b)(5).

In March 2005, the FCC promulgated new rules prohibiting LECs from charging CMRS providers tariff-based rates for transport and termination of local traffic. *See* Intercarrier Compensation, 70 Fed. Reg. 16,141 (Mar. 30, 2005); 47 C.F.R. § 20.11(d) (2005). The FCC explained that as of April 29, 2005, the effective date of the new rules, "any existing wireless termination tariffs shall no longer apply" and "[a]fter that date, in the absence of a request for an interconnection agreement, no compensation will be owed for termination of [local] traffic." Intercarrier Compensation, 70 Fed. Reg. at 16,141. The new rule authorized incumbent LECs to initiate negotiation of interconnection agreements under the 1996 Act, *see* 47 C.F.R. § 20.11(e), and in November 2005, AT&T Nevada took advantage of this provision and requested an

interconnection agreement with Autotel, presumably in an effort to secure a new compensation arrangement. The parties still could not agree. Autotel alleges that AT&T Nevada refused to provide Autotel with the same digital interconnection that it used in its own network unless Autotel accepted AT&T Nevada's standard terms and conditions, which were unacceptable to Autotel.

On August 8, 2006, Richard Oberdorfer, Autotel's president and sole shareholder, filed a complaint with the PUCN on behalf of Autotel alleging that AT&T Nevada refused to negotiate in good faith, and asking the PUCN to order AT&T Nevada to provide digital interconnection on Autotel's terms. The PUCN rejected the complaint without prejudice for failure to comply with the Commission's procedural requirements for telecommunications complaints. It did not address the merits. Oberdorfer refiled the complaint a few days later. The PUCN again summarily rejected the complaint as procedurally deficient. Rather than correct and refile the complaint with the PUCN, Autotel filed suit in federal district court under 47 U.S.C. § 207.[2]

Autotel asserted three claims before the district court. Only two remain on appeal. We consider each claim in turn.

### DISCUSSION

### I.    Standard of Review

We review de novo the district court's order granting a

_____

[2] 47 U.S.C. § 207 provides, in relevant part:

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the [FCC] as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction . . . .

motion to dismiss under Rule 12(b)(6). *See Western Radio II*, 678 F.3d at 975-76. We " 'generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.' " *Id.* at 976 (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030-31 (9th Cir. 2008)). We accept as true all well-pleaded factual allegations and construe them in the light most favorable to the plaintiff. *See id.*

We likewise review de novo a district court's grant of summary judgment. *Verizon California*, 462 F.3d at 1150. "We must determine, viewing the evidence in the light most favorable to . . . the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## II.   Failure to Negotiate in Good Faith

Autotel claims that AT&T Nevada violated 47 U.S.C. §§ 251(c) and 252(a) by failing to negotiate in good faith "to provide interconnection that comports with the [1996 Act]." We hold that the district court properly dismissed this claim because Autotel did not exhaust its administrative remedies.

**[1]** In *Western Radio I*, 530 F.3d at 1196, we held that "prudential concerns require that [the plaintiff] present its good faith claim to the PUC before bringing suit in district court under § 207." *See also id.* at 1200 ("[G]iven the nature of [the plaintiff 's] asserted cause of action and the role allotted to state commissions by Congress, . . . the PUC must address [the plaintiff 's] good faith claim before that claim may be brought in district court."). The parties agree that this prudential exhaustion requirement applies to Autotel's good faith claim but disagree as to whether Autotel satisfied it.

The PUCN twice rejected Autotel's complaint without prejudice and without considering the merits because the com-

plaint did not comply with the PUCN's procedural rules. With respect to the second filing, the PUCN noted that Autotel had simply "changed the title of the document without addressing any of the substantive deficiencies or inconsistencies." The PUCN "strongly recommended that [Autotel] retain or at least consult with competent legal counsel" before refiling because the incomplete submission "demonstrate[d] a lack of required expertise and familiarity with the Commission's rules and regulations." It explained that it would apply any filing fee that Autotel had already paid to any new submission.

**[2]** Autotel contends that its actions were sufficient to satisfy the prudential exhaustion requirement set forth in *Western Radio I*. We disagree. In the words of the district court:

> Were we to conclude that Autotel's efforts were sufficient, parties seeking to avoid the state regulatory process would have an easy row to hoe: they would need only to present a noncompliant application with the PUCN, wait for the claim to be dismissed, and then file suit in federal court.

Such an administrative bypass would undermine the statutory and regulatory framework underlying the 1996 Act. *See Western Radio I*, 530 F.3d at 1201 (adopting prudential exhaustion requirement to discourage bypass of the administrative process).

In addition, it is undisputed that the PUCN did not decide Autotel's good faith claim on the merits. *Western Radio II* presented a similar scenario. There, the plaintiff attempted to raise its good faith claim before the state PUC by an improper request for arbitration. *See Western Radio II*, 678 F.3d at 975. The PUC summarily dismissed the petition without reaching the merits. *See id.* We concluded that the PUC's dismissal of the petition "in no way represented a ruling on any good faith claim" and therefore did not support the plaintiff's contention that it had exhausted its claim. *Id.* at 978. We therefore

affirmed the district court's dismissal for failure to exhaust because the good faith claim "was never properly presented to, nor decided by, the PUC." *Id.* at 979.

The same is true here. The PUCN summarily rejected Autotel's complaint on procedural grounds and made no mention of the substantive merits of Autotel's claim. It dismissed the complaint without prejudice and explained that Autotel could refile without paying additional fees. In addition to eviscerating *Western Radio I*'s exhaustion requirement, permitting this sort of purely procedural decision to constitute administrative exhaustion would undermine the "uniquely prominent role" that Congress intended state PUCs to have in the process of negotiation and approval of interconnection agreements under the 1996 Act, "including the duty to interpret and enforce the obligation to negotiate in good faith." *Western Radio I*, 530 F.3d at 1200-01. It would upset the balance that we struck in *Western Radio I* "between the rights of parties to bring their private causes of action in federal court and a statutory scheme providing an alternative means of resolution before an agency." *Id.* at 1202.

Autotel also argues that its complaint to the PUCN was not procedurally flawed and that any failure to exhaust should be excused because returning to the PUCN, which "refuses to address the good faith issue," would be futile. These arguments are unpersuasive. The PUCN did not refuse to address Autotel's good faith claim. Rather, it enforced the procedural requirements of the Nevada Administrative Code. *See*, *e.g.*, Nev. Admin. Code §§ 704.68035-.680365 (regarding telecommunications complaints); Nev. Admin. Code §§ 703.280-.296 (regarding petitions submitted to the PUCN pursuant to 47 U.S.C. §§ 251 and 252). There is no reason to believe that had Autotel submitted a procedurally conforming filing, the PUCN would have rejected it.[3] Nor do we agree that because

---

[3]For the first time in its reply brief, Autotel argues that state law does not provide a process through which it can exhaust its claim that AT&T

Autotel appeared before the PUCN pro se, the Commission should have overlooked any procedural defects in Autotel's complaint. *See Western Radio II*, 678 F.3d at 978-79 (rejecting the same argument). We are not reviewing the PUCN decision, and the PUCN is not a party to this action. In addition, unlike the pleadings rejected in the cases Autotel cites in support of this argument, Autotel's nonconforming complaints were dismissed without prejudice. This is not "an unjust and excessive sanction." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1268 (9th Cir. 1992).

Finally, we reject Autotel's contention — unsupported by citation to authority — that the procedures set forth in the Nevada Administrative Code do not apply to its PUCN complaint because its claim was based on federal law. To the contrary, Nevada law expressly provides that the provisions of the Nevada Administrative Code govern practice before the PUCN, including in proceedings under the 1996 Act. *See, e.g.*, Nev. Admin. Code § 703.105 (general practice before the PUCN); Nev. Admin. Code § 703.280 (petitions submitted under the 1996 Act); Nev. Admin. Code § 704.680351 (complaints relating to public utilities, including telecommunications carriers). We recognized that state procedural rules would govern such proceedings when we cited the Oregon PUC's procedures as pertinent to our prudential exhaustion analysis in *Western Radio I. See* 530 F.3d at 1198.

---

Nevada violated its duty to negotiate in good faith because there is no "applicable law that requires the state commissions to even decide issues regarding bad faith in negotiation." (Emphasis omitted.) "[A]rguments raised for the first time in a reply brief are waived." *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) (internal quotation marks omitted). In addition, Autotel cites no authority in support of this proposition, and nothing in the PUCN's notices rejecting Autotel's complaints suggests the Commission believed it lack authority to adjudicate the claim. "We will not do an appellant's work for it, either by manufacturing its legal arguments, or by combing the record on its behalf for factual support." *Western Radio II*, 678 F.3d at 979.

## III.    Failure to Provide Interim Interconnection

Autotel contends that AT&T Nevada violated 47 C.F.R. §§ 51.715 and 20.11(e) by refusing to provide digital interconnection with symmetrical pricing on an interim basis during negotiation of a permanent interconnection agreement. We agree with the district court that because Autotel had an existing interconnection arrangement with AT&T Nevada, AT&T Nevada had no obligation to provide interim interconnection or symmetrical pricing under these sections.[4]

First, Autotel argues that under 47 C.F.R. § 51.715, once it initiated negotiation of an interconnection agreement under the 1996 Act (in August 1996), AT&T Nevada was required to provide interim digital interconnection for the transport and termination of telecommunications traffic at symmetrical rates.[5] Autotel contends that the analog interconnection arrangement between Autotel and AT&T Nevada did not satisfy AT&T Nevada's interconnection obligation because it was established before Congress passed the 1996 Act and did not provide for reciprocal compensation. We disagree.

[3] By its terms, 47 C.F.R. § 51.715 requires an incumbent LEC such as AT&T Nevada to provide transport and termination of local traffic under an interim arrangement only when it receives such a request from a telecommunications carrier that does not already have an interconnection arrangement

---

[4]The district court also found that even if AT&T Nevada did have such an obligation, Autotel's claim was time barred. Because we agree with the district court that AT&T Nevada had no regulatory obligation to provide an interim interconnection arrangement, we do not address this alternate holding.

[5]Under a symmetrical compensation arrangement, "the rate paid by an incumbent LEC to another telecommunications carrier for transport and termination of traffic originated by the incumbent LEC is the same as the rate the incumbent LEC charges to transport and terminate traffic originated by the other telecommunications carrier." *Local Competition Order*, 11 FCC Rcd. at 16031, ¶ 1069.

providing for the transport and termination of telecommunications traffic by the incumbent. *See* 47 C.F.R. § 51.715(a).[6] Similarly, the obligation to provide interim transport and ter-

---

[6]Until recently, 47 C.F.R. § 51.715 provided, in relevant part:

(a) Upon request from a telecommunications carrier *without an existing interconnection arrangement with an incumbent LEC*, the incumbent LEC shall provide transport and termination of telecommunications traffic immediately under an interim arrangement, pending resolution of negotiation or arbitration regarding transport and termination rates and approval of such rates by a state commission under sections 251 and 252 of the Act.

(1) *This requirement shall not apply when the requesting carrier has an existing interconnection arrangement that provides for the transport and termination of telecommunications traffic by the incumbent LEC.*

(2) A telecommunications carrier may take advantage of such an interim arrangement only after it has requested negotiation with the incumbent LEC pursuant to § 51.301.

(b) Upon receipt of a request as described in paragraph (a) of this section, an incumbent LEC must, without unreasonable delay, establish an interim arrangement for transport and termination of telecommunications traffic at symmetrical rates.

(1) In a state in which the state commission has established transport and termination rates based on forward-looking economic cost studies, an incumbent LEC shall use these state-determined rates as interim transport and termination rates.

(2) In a state in which the state commission has established transport and termination rates consistent with the default price ranges and ceilings described in § 51.707, an incumbent LEC shall use these state-determined rates as interim rates.

(3) In a state in which the state commission has neither established transport and termination rates based on forward-looking economic cost studies nor established transport and termination rates consistent with the default price ranges described in § 51.707, an incumbent LEC shall set interim transport and termination rates at the default ceilings for end-office switching (0.4 cents per minute of use), tandem switching (0.15 cents per minute of use), and transport (as described in § 51.707(b)(2)).

47 C.F.R. § 51.715 (2001) (emphasis added). The FCC amended the rule, effective December 29, 2011. *See* Establishing Just and Reasonable Rates for Local Exchange Carriers, 76 Fed. Reg. 73,830, 73,856 (Nov. 29, 2011). Because the amendments do not alter the outcome, we refer to the regulation as it was in effect when the parties briefed and argued the case.

mination of telecommunications traffic at symmetrical rates is triggered "[u]pon receipt of a request as described in paragraph (a) of this section," 47 C.F.R. § 51.715(b), which refers to a "request from a telecommunications carrier *without an existing interconnection arrangement*," 47 C.F.R. § 51.715(a) (emphasis added). The FCC promulgated this regulation to accelerate the pace at which new entrants to the local market could initiate service:

> We are concerned that some new entrants that do not already have interconnection arrangements with incumbent LECs may face delays in initiating service solely because of the need to negotiate transport and termination arrangements with the incumbent LEC. . . . To promote the Act's goal of rapid competition in the local exchange, we order incumbent LECs upon request from new entrants to provide transport and termination of traffic, on an interim basis, pending resolution of negotiation and arbitration regarding transport and termination prices, and approval by the state commission. . . . We also conclude that interim prices for transport and termination shall be symmetrical. *Because the purpose of this interim termination requirement is to permit parties without existing interconnection agreements to enter the market expeditiously, this requirement shall not apply with respect to requesting carriers that have existing interconnection arrangements that provide for termination of local traffic by the incumbent LEC.*

*Local Competition Order*, 11 FCC Rcd. at 16029, ¶ 1065 (emphasis added).

**[4]** It is undisputed that at all relevant times, Autotel had an existing interconnection arrangement with AT&T Nevada that provided for the transport and termination of local telecommunications traffic. Thus, AT&T Nevada had no obliga-

tion under § 51.715 to establish an interim arrangement with symmetrical rates.

**[5]** Autotel also argues that the FCC voided Autotel's existing arrangement with AT&T Nevada when it amended 47 C.F.R. § 20.11 to prohibit incumbent LECs from imposing tariff-based compensation obligations on CMRS providers. *See supra* at 10553; Intercarrier Compensation, 70 Fed. Reg. 16,141, 16,141 (Mar. 30, 2005) (prohibiting LECs "from imposing compensation obligations for non-access traffic pursuant to tariff" and providing that "any existing wireless termination tariffs shall no longer apply upon the effective date of these amendments to our rules"); 47 C.F.R. § 20.11(d) ("Local exchange carriers may not impose compensation obligations for traffic not subject to access charges upon commercial mobile radio service providers pursuant to tariffs."). The FCC adopted this rule after several CMRS providers argued that LECs who charged CMRS providers by tariff were effectively bypassing the negotiation and reciprocal compensation regime contemplated by the 1996 Act and FCC regulations. *See In re Developing a Unified Intercarrier Compensation Regime* (*T-Mobile Order*), 20 FCC Rcd. 4855, 4855, ¶ 1 (Feb. 24, 2005).

**[6]** Although the rule change may have prohibited AT&T Nevada from continuing to charge Autotel tariff-based rates for transport and termination of local traffic,[7] nothing suggests that it disrupted Autotel's interconnection with AT&T Nevada's network. It appears to be undisputed that even after the rule's effective date, Autotel retained its analog interconnection, which continued to provide for the transport and termination of local telecommunications traffic.

Next, Autotel seeks to leverage the fact that in November 2005, AT&T Nevada invoked 47 C.F.R. § 20.11(e) to revive

---

[7]The district court found as much, but this question is not before us on appeal, and we do not decide it.

the parties' negotiation of an agreement under the 1996 Act. *See supra* at 10553-54. Autotel contends that under § 20.11(e), when an incumbent LEC initiates negotiations under the 1996 Act, the interim pricing requirement in § 51.715(b) operates independently of § 51.715(a), and applies even when there is an existing interconnection arrangement between the parties.

As adopted in March 2005, § 20.11(e) provided,

> An incumbent local exchange carrier may request interconnection from a commercial mobile radio service provider and invoke the negotiation and arbitration procedures contained in section 252 of the Act. A commercial mobile radio service provider receiving a request for interconnection must negotiate in good faith and must, if requested, submit to arbitration by the state commission. *Once a request for interconnection is made, the interim transport and termination pricing described in § 51.715 of this chapter shall apply.*

47 C.F.R. § 20.11(e) (emphasis added).[8] Autotel contends that the italicized sentence refers only to the transport and termination rates described in § 51.715(b)(1)-(3) and does not incorporate § 51.715(a), which expressly limits the rule's application to circumstances in which there is not already an existing interconnection arrangement. AT&T Nevada, for its part, argues that § 20.11(e)'s cross-reference to § 51.715 encompasses § 51.715 in its entirety and therefore — like § 51.715 — applies only when there is no existing intercon-

---

[8]The FCC amended § 20.11, effective January 11, 2012. *See* Developing an Unified Intercarrier Compensation Regime, 77 Fed. Reg. 1,637, 1,640 (Jan. 11, 2012). Because the amendments do not alter the outcome — if anything, they further undermine Autotel's argument by eliminating the final sentence of subparagraph (e) — we refer to the regulation as it was in effect when the parties briefed and argued the case.

nection arrangement between the incumbent LEC and the CMRS provider — essentially creating parallelism between the two regulations.

That § 20.11(e) refers to "the interim transport and termination *pricing* described in § 51.715" lends some support to Autotel's position. *Id.* (emphasis added). It is plausible that this sentence refers only to the rates set forth in § 51.715(b) for interim transport and termination of telecommunications traffic, and not to § 51.715(a)'s obligation to provide such transport and termination in the first place, which, as we explain above, applies only if the competing carrier does not have an existing interconnection arrangement. This is, to some extent, consistent with the FCC's explanation of the rule. *See* Intercarrier Compensation, 70 Fed. Reg. at 16141 (explaining that under § 20.11(e), "during the period of negotiation and arbitration, the parties will be entitled to compensation in accordance with *the interim rate provisions* set forth in § 51.715" (emphasis added)).

**[7]** Nevertheless, considering the applicable regulations together, we conclude that Autotel has not established that § 20.11(e) created an independent pricing obligation. On its face, § 20.11(e)'s cross-reference cites "§ 51.715 of this chapter" generally, rather than subsection (b) specifically. In addition, § 51.715 is titled "Interim transport and termination pricing." Section 20.11(e)'s use of that phrase is thus more naturally read as a reference to § 51.715 generally, not as an implied reference to subsection (b) alone. We therefore conclude that § 20.11(e)'s cross-reference incorporates all of § 51.715. Autotel's argument might have traction if Autotel could show that the interim transport and termination requirement in § 51.715(a) had no relevance or practical application in the circumstances contemplated by § 20.11(e) — when an incumbent LEC initiates negotiation of an interconnection agreement — or that an incumbent LEC would never invoke § 20.11(e) to initiate negotiations with a CMRS provider with whom it did not have an existing interconnection arrange-

ment. Autotel has not made this argument, however, and the record does not appear to support it.

**[8]** To the contrary, the administrative history of the rule suggests that the FCC expected incumbent LECs to use § 20.11(e) to secure agreements with CMRS providers with whom they did not previously have interconnection arrangements. In its order announcing the amendments to § 20.11, the FCC acknowledged that by relying on intermediary networks, many CMRS providers were able to exchange telecommunications traffic with incumbent LECs without entering into interconnection agreements or other compensation arrangements with the incumbents. *See T-Mobile Order*, 20 FCC Rcd. at 4857, ¶ 5. It recognized that without the ability to charge by tariff (which the amendments prohibited, *see supra* at 10562 (discussing § 20.11(d))), incumbent LECs "may have . . . difficulty obtaining compensation from CMRS providers" because they could not compel CMRS providers to negotiate or arbitrate interconnection agreements under the 1996 Act. *T-Mobile Order*, 20 FCC Rcd. at 4864, ¶ 15. The FCC promulgated paragraph (e) to remedy this gap in the regulatory regime — it granted to incumbent LECs the same ability as CMRS providers to compel negotiation and arbitration under § 252 of the 1996 Act. *See id.* at 4864-65, ¶ 16. Because negotiations might take several months, the FCC "establish[ed] interim compensation requirements under section 20.11 *consistent with those already provided in section 51.715.*" *Id.* at 4865, ¶ 16 (emphasis added). As we explained above, § 51.715 requires an incumbent to provide an interim arrangement with symmetrical pricing only to a competing carrier that does not already have an existing interconnection arrangement with the incumbent.

The unfairness that Autotel perceives in this regime appears to have been ameliorated, at least for CMRS providers such as Autotel, by § 51.717, which long provided for symmetrical reciprocal compensation during renegotiation of existing

arrangements between CMRS providers and incumbent LECs. Section 51.717 provided,

> (a) Any CMRS provider that operates under an arrangement with an incumbent LEC that was established before August 8, 1996 and that provides for non-reciprocal compensation for transport and termination of telecommunications traffic is entitled to renegotiate these arrangements with no termination liability or other contract penalties.

> (b) From the date that a CMRS provider makes a request under paragraph (a) of this section until a new agreement has been either arbitrated or negotiated and has been approved by a state commission, the CMRS provider shall be entitled to assess upon the incumbent LEC the same rates for the transport and termination of telecommunications traffic that the incumbent LEC assesses upon the CMRS provider pursuant to the pre-existing arrangement.

47 C.F.R. § 51.717. In promulgating § 51.717, the FCC determined that CMRS providers operating pursuant to arrangements that predated enactment of the 1996 Act should be permitted to renegotiate those arrangements under the more favorable post-1996 Act regime without termination liability or other contractual penalty. *See Local Competition Order*, 11 FCC Rcd. at 16044-45, ¶¶ 1094-1095.

Autotel alleged in its complaint that AT&T Nevada "refused to pay reciprocal compensation as required by 47 CFR 51.717(b)." It reiterated this allegation in opposition to summary judgment and in briefing before this court. Autotel did not, however, assert a claim under § 51.717, and the district court did not address it. Likewise, on appeal AT&T Nevada did not respond in briefing or at oral argument to Autotel's arguments relating to § 51.717.

Whether relief is available to Autotel under § 51.717 turns on a number of factual and legal issues that the district court has not yet addressed. Among other things, we note that the FCC recently revised the reciprocal pricing regulations at issue here and eliminated § 51.717 altogether. *See* Establishing Just and Reasonable Rates for Local Exchange Carriers, 76 Fed. Reg. at 73,856. We leave it to the district court to consider in the first instance what, if any, impact these changes have on any claim Autotel may have under § 51.717.[9]

[9] We therefore (1) **affirm** the district court's dismissal of Autotel's good faith claim; (2) **affirm** the district court's grant of summary judgment on Autotel's claim under 47 C.F.R. §§ 51.715 and 20.11; and (3) **remand** to the district court for the limited purpose of considering whether Autotel adequately pled a claim for relief under § 51.717 and, if so, for further proceedings as appropriate.

The parties shall bear their own costs on appeal.

**AFFIRMED AND REMANDED.**

---

[9]Autotel argues in a single sentence in its opening brief that AT&T Nevada violated §§ 51.715 and 20.11 by "disconnect[ing] existing interconnection." This contention appears to refer to AT&T Nevada's disconnection of a single line that Autotel used to test and administer its switch, not for subscriber traffic. Although Autotel raised this argument before the district court, the conclusory statement in its opening brief, unaccompanied by argument or citation to the record, is insufficient to preserve the issue for appeal, and we do not address it. *See Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived."); *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 n.1 (9th Cir. 1995) ("Although the issue . . . is summarily mentioned in [appellant's] opening brief, it has not been fully briefed, and we therefore decline to address it.").